694 A.2d 196

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. KEVIN SCHERZER, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. KYLE SCHERZER, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. CHRISTOPHER ARCHER, DEFENDANT– APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 23, 1997—Decided May 20, 1997.

364

386

388

Before Judges SHEBELL, BAIME and BRAITHWAITE.

*John Vincent Saykanic, J. Michael Blake,* Assistant Deputy Public Defender, and *Neal M. Frank* argued the cause for appellants (*Susan Reisner,* Public Defender, attorney; *Mr. Saykanic,* of counsel, and on the brief for appellant, Kevin Scherzer; *Mr. Blake,* of counsel, and on the brief for appellant, Kyle Scherzer; *Mr. Frank,* of counsel, and on the brief for appellant, Christopher Archer).

*Elizabeth Miller–Hall* argued the cause for respondent (*Clifford Minor,* Essex County Prosecutor, attorney; *Ms. Miller–Hall, Barbara Rosenkrans,* and *Elizabeth Duelly,* of counsel, and on the brief; *Robert Laurino* and *Nina Bonner,* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

In May 1990, defendants, Kevin Scherzer and Kyle Scherzer, twin brothers, were indicted, along with three co-defendants, Peter Quigley, Richard Corcoran, Jr., and John Maher, on various sexual assault charges allegedly committed against a mentally defective victim, M.G. In September 1990, the prosecutor's application to have three juveniles, Christopher Archer, his brother Paul Archer, and Bryant Grober, tried as adults was granted. Therefore, in September 1991, a superseding indictment was obtained charging all eight defendants with second degree conspiracy to commit aggravated sexual assault (*N.J.S.A.* 2C:5–2 and 2C:14–2a(5), Count One); two counts of first degree aggravated sexual assault (sexual penetration of mentally defective person) (*N.J.S.A.* 2C:14–2a(5)(b), Counts Two and Four); two counts of first degree aggravated sexual assault (sexual penetration using physical force or coercion) (*N.J.S.A.* 2C:14–2a(5)(a), Counts Three and Five); and four counts of third degree aggravated criminal sexual contact (*N.J.S.A.* 2C:14–3a, Counts Six, Seven, Eight, and Nine).

Pretrial hearings and motions began in June 1991, and continued until March 1992. On April 3, 1992, Quigley pled guilty to endangering the welfare of an incompetent person (*N.J.S.A.* 2C:24–7), a disorderly persons offense. Defendants' motion to seal Quigley's statement was granted. In May 1992, the State's motion to sever the trial of Corcoran was granted, and the indictment was dismissed as to Corcoran in January 1994, after defendants' trial was completed. Defense motions to dismiss the indictments and for severance of the trials of Christopher Archer, Grober, and John Maher were denied, and we denied leave to appeal. On June 23, 1992, Paul Archer gave a statement as a condition of his acceptance into the pretrial intervention program ("PTI") and then pled guilty to endangering the welfare of an incompetent person.

Several Rape Shield Law hearings followed between July, 1992, and September 1992. Jury voir dire began on September 22, 1992, and the trial followed on October 15, 1992. On October 20, 1992, an in-camera hearing was held on the admissibility, under the Rape Shield Law, of portions of tapes made of conversations with M.G. Following six days of jury deliberations, the trial concluded on March 16, 1993. The three appellants, Kevin Scherzer, Kyle Scherzer and Christopher Archer, were convicted of second degree conspiracy to commit aggravated sexual assault (Count One), and first degree aggravated sexual assault by force or coercion (Count Three). They were acquitted of Counts Four through Nine. In addition, Christopher Archer and Kevin Scherzer were convicted of first degree aggravated sexual assault upon a mentally defective person (Count Two), and Kyle Scherzer was convicted of the lesser included offense of second degree attempted aggravated sexual assault. Bryant Grober, who has not appealed, was convicted of third degree conspiracy to commit aggravated criminal sexual contact and was acquitted of all other charges.

At sentencing on April 23, 1993, appellants' convictions on Counts One and Two were merged into their convictions on Count

Three. They were then sentenced as young adult offenders to the Youth Correctional Institution Complex for indeterminate terms with fifteen-year maximums, but were continued on bail pending appeal.

Kyle and Kevin Scherzer and Christopher Archer, appeal. Although the State also filed a notice of cross-appeal, it did not pursue its cross-appeal when it submitted its briefs in response to defendants' briefs on appeal.

## FACTS

M.G. lived in Glen Ridge most of her life, where she attended special education classes at the elementary and middle schools. In 1989, when seventeen years of age, she attended classes for the "educably mentally retarded" at West Orange High School. She participated in athletics programs, such as softball and basketball, at Glen Ridge High School. Defendants were also Glen Ridge residents and M.G. had known them since grade school.

At trial M.G. testified that on the afternoon of March 1, 1989, she went to Carteret Park in Glen Ridge, to play basketball. There she saw the Archer brothers, Corcoran, and another boy. While she was shooting baskets, Christopher Archer, Grober, Quigley, and two other boys greeted her. In her direct testimony, M.G. said that Grober told her that if she went to the Scherzers' basement with them she would get to go out with Paul. However, on cross-examination she said that she went up to Grober, placed her hand on his crotch, and said something to the effect of "Nice package you have there. Would you like a blow job?" On redirect, she stated the latter testimony was a lie, as she did not want to hurt people.

She said she walked to the Scherzers' house with Christopher Archer, who put his arm around her shoulders. She viewed this as "romantic." When they arrived, there were already "a lot of people" on the stairs and in the basement. Others started setting up chairs near the couch, while she and Grober sat on the couch. M.G. said that when some of the boys asked her to, she took off

her sweat pants and T-shirt. Thereafter, at the urging of the boys, sexual activity occurred beginning with M.G. inserting her fingers in her vagina, her masturbating and performing fellatio on five of the young men, permitting Kevin to insert a broomstick and Christopher to insert the handle of a baseball bat into her vagina. She said she permitted Corcoran to put a small stick in her vagina. Four of the boys also sucked on her breasts. Before she left, some of the boys told her "not to tell anybody" or they would tell her mother and she would "get in trouble."

Paul Archer, called on behalf of the defense, testified to a different account of the events. He said he and Quigley went to the park because he had heard some baseball players would be throwing the ball around. When they arrived, they went over to talk to the Scherzer brothers and some other friends who were on the basketball court. Soon afterward, Grober and Christopher arrived. Then M.G. arrived carrying a basketball and went directly to Grober. Paul overheard M.G. say, "Bryant, you're really hot. You're sexy. I like your bod[y]. You have a nice package." Grober appeared startled. Paul said that in all the years he had known Grober, he had never before seen him engage in conversation with M.G. After M.G. made these comments to Grober, Paul saw her reach for Grober's crotch, and Grober lunged back. M.G. then asked if Grober wanted a "blow job." At first Grober did not take her seriously, but after they talked, he asked if she meant it.

Paul and Quigley walked to the Scherzers' house, where there were "a couple of guys" playing Nintendo in the basement. Soon, Grober and M.G. appeared. Paul observed Grober drop his pants, and M.G. kneel down and perform fellatio. After a while, he saw Grober rest his hand on M.G.'s shoulder, but did not observe him exert pressure. Grober then moved his hand to the top of M.G.'s head, but once again no pressure was exerted. He did not hear M.G. say any words of resistance. According to Paul, the entire act took about thirty seconds. Grober then sat down and did not participate in any other sexual activity with M.G.

According to Paul, M.G., who was "totally in control" of the events, then said that "that blow job just got me so horny, I want to have sex with someone." When no one responded, she stood up, pulled down her pants, and then laid down on the couch. He said she then placed her fingers followed by the other objects into her vagina voluntarily. Kevin and Christopher helped her move the broomstick in and out. On cross-examination, Paul admitted that he had testified, when the judge was taking his guilty plea, that his brother and Kevin had inserted the broomstick into M.G., but said that testimony was a mistake.

He said that as people started to leave, M.G. walked to him, pulled up her shirt and bra, and said, "Paul, don't you like my breasts?" She asked him to touch them, but he refused. He said no one else touched her breasts, nor did he observe M.G. masturbating any of the boys or anyone doing anything with a stick. When M.G. asked if the boys wanted to "come back another day and do it again," no one responded. Some of the boys said, "[Y]ou're not going to say anything about this?" and she said no. He said that the entire incident, from the time M.G. first walked up to Grober at the park until she left the basement, lasted about twenty minutes.

Three boys who said they left the basement soon after the sexual activity began testified for the State. They agreed that M.G.'s activities with Grober, which is all they witnessed, appeared to be voluntary, as they did not see Grober use any force.

The first adult to whom M.G. related the incident was her swimming instructor, who testified that on March 3, 1989, after the swim class, M.G. came to talk to her, but seemed hesitant. M.G. said she had gone to a party during the week, that there were boys there, and that "something had happened." When asked what happened, M.G. said she did not want to talk about it now. The next day the instructor talked to M.G. in the locker room. M.G. told her she had gone to someone's basement and the boys asked her to "suck their dicks" and "stuck something up [her] butt." The instructor told M.G.'s classroom teacher at West

Orange High School about the incident. The teacher informed M.G.'s parents about a week after the incident occurred. When M.G. learned that the instructor had told others about the incident, she was angry and said that it was her own fault that the "boys got in trouble" and that "she was going to lie."

M.G.'s mother took her to a gynecologist on March 14, 1989, however, a pelvic examination showed nothing abnormal. Her mother first met with the Glen Ridge police on March 22, 1989, and on March 27, 1989, M.G. and her mother met with Detective Sheila Byron. They brought a stick M.G. had brought home after the incident. Detective Byron became the principal investigator on the case.

M.G. gave the prosecution four statements—on April 7, May 5, May 18, and August 3, 1989. In the third statement the word "forced" in the phrase "additional acts were forced upon me" was crossed out and changed to "done." The investigator who took the statement from M.G. testified that he made the change because he did not think she knew "what the concept of the word force was." However, under cross-examination, M.G. testified that she requested the change because the acts were not forced on her.

M.G.'s fourth statement included her first accusation against Corcoran. She said she had not related this earlier because she had not wanted to get Detective Byron "in any trouble ... [with] her boss [who was related to Corcoran]." M.G. later told her mother that she had lied about Corcoran's involvement. Her mother immediately relayed this to the police. After a June 6, 1990, meeting at the prosecutor's office to discuss M.G.'s recantation, Byron had a private conversation with M.G. during which M.G. retracted her recantation and said that Corcoran had put the stick inside her.

M.G. said she had recanted because "everybody is behind him [Corcoran]," or possibly because her mother did not believe her about Corcoran, or "it could have been Maricarmen [Ferraez] who told me to say Richie didn't do anything." This was the first

Byron had heard about M.G.'s conversations with Ferraez, a friend of the Scherzers whom M.G. knew from her basketball team. Between September and November 1989, Ferraez had taken M.G. out for ice cream on several occasions and during their time together Ferraez had secretly taped conversations in which she persuaded M.G. to talk about the incident and her prior sexual history. Following Rape Shield Law hearings, the Ferraez tapes were redacted and played for the jury. They were also discussed by the State's expert witnesses.

The State presented numerous witnesses who testified concerning M.G.'s personality, mental acuity, and the way she was perceived by others. A teacher who taught M.G. and other educable mentally retarded students at West Orange High School, said that M.G. functioned verbally on a second-grade level, had poor self-esteem, and was "very easily led" by people whom she hoped would like her. An instructor, who in 1982 taught tennis to a group of children that included M.G. and the Archers, all about eleven or twelve at the time, testified that the other children, including the Archers, would call M.G. "stupid" and "a retard." He said that when he offered M.G. the opportunity to be in a different group, she said those boys were her friends and she wanted to be with them.

Dawn Lipinski, the sister of M.G.'s friend Jennifer Lipinski, testified that "everyone knows that [M.G.] is different." She also said that M.G. would "do anything that she's asked to do" and that she had never heard her say no to any request. M.G.'s sister also said that everybody knew that M.G. was different. She testified that M.G. talks as if she is five or six years old, cannot follow simple instructions, and does not understand money. As an example of how easily led M.G. was, her sister said that when M.G. was five years old, a group of children, including Kyle and Kevin, persuaded her to eat dog feces.

M.G.'s mother testified about the social problems that emerged when M.G. was attending Columbia High School in Maplewood in 1987. She said M.G. would act the part of the class clown, setting

herself up for ridicule. M.G.'s teachers at Columbia were concerned she might be raped. This led her mother to have her gynecologist prescribe birth control pills for her. M.G.'s mother also testified that, prior to the incident, M.G. had received sexual phone calls from Christopher Archer.

A guidance counselor at Columbia High School, testified about the sexual incidents in which M.G. was involved while at Columbia. M.G. told someone that "she wanted to be fucked," she would regularly exchange sexual comments with a group of football players in the cafeteria, and someone once touched her breast in health class. After these incidents, the guidance counselor claimed to have told M.G. that she had a right to refuse to allow someone to touch her body, but she could not understand this concept, especially when the person touching her was a friend.

The young men who testified at trial about the incident, three for the State and one for the defense, Paul Archer, all acknowledged it was common knowledge that M.G. was different. She was described as hard to communicate with, and as "slower, simple," something one could recognize after a few minutes of conversation. She associated mainly with younger children, was subjected to teasing, was the butt of jokes, was in special education classes, and was called "a retard."

The State presented three expert witnesses: Dr. Susan Esquilin, a psychologist specializing in the area of sexual abuse; Dr. Gerald Meyerhoff, a psychiatrist specializing in the field of child and adolescent psychiatry and mental retardation in children and adolescents; and Dr. Ann Burgess, a registered nurse with a doctorate in psychiatric mental health nursing and a specialist in the field of rape trauma.

Dr. Esquilin administered an I.Q. test on which M.G. scored 64, the mildly-mentally retarded range. On the adaptive behavior test, which measures daily living skills, M.G. scored in the top half, when compared to other retarded people. According to Esquilin, M.G. had a high risk of victimization because "she so focused on what somebody else wants and needs and not what she feels she

wants and needs.... She's likely to do what anybody asks her to do." Esquilin expressed the opinion that M.G. is mentally defective, as she is incapable of exercising the right to refuse to engage in sexual conduct, and understands coercion only as the use of physical force. To M.G., her sexuality was a way of pleasing others. Esquilin's review of the Ferraez tapes strengthened her opinion that M.G. was susceptible to coercion and social pressure and that she had an immature concept of friendship.

Dr. Meyerhoff diagnosed M.G. as mildly-mentally retarded and suffering from attention-deficit hyperactivity disorder, residual state. He did not diagnose her as suffering from post-traumatic stress disorder, as defined in the *Diagnostic and Statistical Manual of Mental Disorders III* (*"DSM III"*). In his opinion, M.G. was "mentally defective" because although she understood that she was engaging in conduct of a sexual nature, she did not understand that she had the right to refuse to participate in the sexual activity. His review of the Ferraez tapes did not alter his opinion. Under cross-examination he acknowledged M.G. was at times sexually aggressive because sexual activity fulfilled her need for friendship, which "was an important part of her life." He also acknowledged that she was capable of lying and being deceptive.

Dr. Burgess, who had co-authored a pioneering study on rape trauma syndrome ("RTS") in 1974, testified about the kinds of reactions she had observed in rape victims and how her observations served to dispel such common myths as that victims immediately report a rape or that all victims display an emotional demeanor after an attack. She said that adolescent rape victims often do not disclose information about rape immediately, especially when the assailant is known to them, because they have divided loyalties about the assailant and fear retaliation. Recantation may be a way of protecting the assailant from getting into trouble or for the victim to deny that the rape occurred.

One of the methods Burgess used when interviewing M.G. was an "event drawing series." She used it to gain both visual and verbal information in a nonleading fashion. She had M.G. draw a

series of pictures, including representations of the basement incident. Defense counsel objected to testimony on the drawings, and their admission into evidence. The judge overruled the objection, but told the jury that "her testimony is not offered to show one way or the other whether [M.G.] was sexually assaulted ... it's to better help you understand some of the issues so that you can decide what really happened back on March 1, 1989."

Additionally, Burgess testified that M.G. suffered from RTS, as M.G. reported the incident only to people with whom she felt safe, and because of the type of friendship she desired with defendants. The Ferraez tapes did not change her opinion because the leading, suggestive questions asked by Ferraez caused M.G. to answer in a way intended to please her friends. Burgess also believed that Ferraez's inclusion in defendants' social network pressured M.G. into recanting her accusation against Corcoran. Under cross-examination, Burgess acknowledged that RTS would fall under the category of post-traumatic stress disorder in the *DSM III*, a condition that Meyerhoff did not believe M.G. suffered from.

## I

We first consider whether the judge erred in denying defendants' judgments of acquittal and whether the jury's verdicts were against the weight of evidence.

Rule 3:18–1 governs motions for a judgment of acquittal. In determining whether the motion should be granted, the trial judge must decide whether "a reasonable jury could find guilt of the charge beyond a reasonable doubt." *State v. Reyes*, 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967). The judge must view the State's evidence, both direct and circumstantial, in its entirety and give "the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn" from that testimony. *Ibid.* In reviewing the judge's determination, we can give no consideration to any evidence or inferences from the defendant's case and must exclude from our consideration any improperly admitted evidence. *Ibid.*

■ At the close of the State's case, defendants moved for judgments of acquittal on all counts of the indictment. The motions were denied as the judge found that a reasonable jury, giving the State the benefit of all reasonable inferences, could find guilt beyond a reasonable doubt on every element of each of the nine counts of the indictment. After presenting their case, defendants renewed their motions for judgment, and the judge again denied the motion, incorporating by reference his reasons for denying the earlier motions. Defendants did not, however, move to set aside the verdicts as against the weight of the evidence.

The first count on which defendants were convicted is conspiracy. The Criminal Code provides:

A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

[*N.J.S.A.* 2C:5-2(a).]

When the State prosecutes a defendant for conspiracy to commit a first or second degree crime, it need not prove that a defendant committed an overt act in pursuance of the conspiracy. *N.J.S.A.* 2C:5-2d. Therefore, because defendants were convicted of conspiracy to commit first and second degree crimes, the sufficiency of the evidence as to the commission of an overt act is not at issue. *Ibid.* The only question is whether a reasonable jury, viewing the State's evidence in its most favorable light, could find beyond a reasonable doubt that defendants, acting with a purposeful state of mind, agreed to commit, attempted to commit, or aided in the commission of an aggravated sexual assault. *Reyes, supra,* 50 *N.J.* at 459, 236 *A.*2d 385.

■ The State presented considerable evidence that several of the boys who eventually ended up in the Scherzers' basement, including Christopher Archer and Grober, approached M.G. while she was shooting baskets at Carteret Park and persuaded her to

join them at the Scherzers'. M.G. testified on direct that Grober told her that if she went to the basement with them, she would get a date with Paul. She also said that when she walked to the Scherzers' house, Christopher Archer had his arm around her shoulders in a romantic fashion. The testimony of M.G., Paul, and three other boys all placed defendants either at the basketball court with M.G. or in the basement when the sexual activity occurred. M.G. also testified to the active participation of defendants. She testified that some of the boys set up chairs in front of the couch. One boy's testimony corroborated this: he said that the boys crowded around the couch "like a tank of piranhas." M.G. also testified that various boys told her to take her clothes off, to insert her fingers into her vagina, and go "further, further, further." Another boy testified that he believed Archer had told M.G. to take her clothes off. According to M.G., when the sexual activity was over, the boys stood in a circle and put their hands together in the center. They told M.G. not to tell anybody about what happened or they would tell her mother what she did.

There was ample testimony that defendants had known M.G. since grade school and were aware she was "slow." M.G.'s own testimony, as well as that of the experts, Esquilin and Meyerhoff, portrayed a young woman who would do anything to please her friends, who considered almost everyone she spoke to a friend, and who was openly sexually aggressive.

A reasonable jury could infer from this evidence that defendants were aware of M.G.'s acquiescent nature and intellectual limitations and agreed to persuade her to join them in the Scherzer basement so that they could engage in sexual activity with her. Once there, each of the defendants participated in the activity as the others watched and offered encouragement and instruction. When they were done, they joined hands in a pact and instructed M.G. not to tell anybody about what had happened further evidencing their common purpose. Thus, the State's evidence was sufficient to support a conviction for conspiracy to commit an

aggravated sexual assault, and the trial judge properly denied their motions for judgments of acquittal.

The judge also denied defendants' motions for judgments of acquittal on the counts charging aggravated sexual assault under *N.J.S.A.* 2C:14–2a(5)(a) and (b). The offenses are defined by the Code as follows:

> a. An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:
>
> . . . .
>
> (5) The actor is aided or abetted by one or more other persons and either of the following circumstances exists:
>
> (a) The actor uses *physical force or coercion,* or
>
> (b) The victim is one whom the actor knew or should have known was physically helpless, *mentally defective* or mentally incapacitated; . . . .
>
> [Emphasis added.]

Under *N.J.S.A.* 2C:14–1c, "sexual penetration" can mean vaginal intercourse, fellatio, or insertion of fingers or objects into the vagina either by the actor or by the victim upon the actor's instruction, with depth of insertion irrelevant to whether the crime was committed. In *State in the Interest of M.T.S.,* 129 *N.J.* 422, 444, 609 *A.2d* 1266 (1992), the Supreme Court held that the definition of "physical force" in *N.J.S.A.* 2C:14–2a(5)(a) is satisfied "if the defendant applies any amount of force against another person in the absence of what a reasonable person would believe to be affirmative and freely-given permission to the act of sexual penetration." There need be no more physical force than that "inherent in the act of sexual penetration." *Ibid.* Under *N.J.S.A.* 2C:13–5, a person is guilty of criminal coercion if,

> with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to:
>
> . . . .
>
> (7) Perform any other act which would not in itself substantially benefit the actor but which is calculated to substantially harm another person with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.
>
> [*N.J.S.A.* 2C:13–5(a)(7).]

■ Therefore, on the third count, the State had to prove that defendants engaged in an act of sexual penetration while aided or abetted by at least one other person and that defendants used force or coercion. *N.J.S.A.* 2C:14–2a(5)(a). Viewing the State's evidence as to defendants' use of force or coercion in a light most favorable to it and ignoring for the purposes of this inquiry Paul's testimony and M.G.'s poor credibility when cross-examined, *Reyes, supra,* 50 *N.J.* at 459, 236 *A.*2d 385, as well as what we conclude was improperly admitted RTS evidence, we are convinced that the State failed to present enough evidence to prove to a reasonable jury that force or coercion were used against M.G. Her testimony and conduct clearly reflect that her engaging in the sexual activity in question was voluntary for purposes of *N.J.S.A.* 2C:14–2a(5)(a), and did not involve force or coercion.

■ M.G. never testified that the sexual activity was done without her consent. There was no evidence that physical force without permission, as defined by *M.T.S, supra,* 129 *N.J.* at 444, 609 *A.*2d 1266, was used by defendants. Nor did we find it reasonable on the evidence presented to infer that force or coercion was engaged in by or on behalf of defendants. Persuasion is not coercion under *N.J.S.A.* 2C:14–2a(5)(a) merely because the victim is mentally defective, as such conduct is specifically covered under subsection (b). Nor is there any indication that M.G. was in any way intimidated by the size or number of the boys present.

In any event, even if a judgment of acquittal were denied, Count Three, charging penetration using physical force or coercion, must ultimately fail as a manifest denial of justice. *See R.* 3:20–1. Paul Archer and two other boys present testified to the absence of force and the voluntariness of M.G.'s actions in the Scherzer basement. M.G.'s own testimony fails to support a finding of force or coercion. She said on direct that she went to the basement because Grober said she would be able to go out with Paul Archer if she did. Even if defendants did lure her to the basement with promises of a date with Paul, the trial judge correctly instructed the jury that being promised a date with Paul was not enough to

constitute criminal coercion. Moreover, on cross-examination she said that she went up to Grober at the park, placed her hand on his crotch, and asked him if he wanted her to give him a blow job. Although on redirect, she said that the latter testimony was a lie, Paul testified to substantially that account of the incident. M.G. also said that she did not try to leave the basement because she wanted to stay, and that she could have left if she wanted to. M.G. said she had the prosecutor change the word "forced" to "done" in her August 3, 1989 statement because the acts were not forced on her. On the Ferraez tapes, M.G. talked about how much fun the incident was, and about several prior incidents of sexual activity on her part. The jury also heard Dr. Meyerhoff describe M.G. as sexually aggressive. Under no proper theory of force or coercion could a reasonable jury find those elements of the offense beyond a reasonable doubt on the admissible facts and applicable law.

However, a different conclusion results as to Count Two. *N.J.S.A.* 2C:14-1(h) defines "mentally defective" as a condition that renders one "temporarily or permanently incapable of understanding the nature of [one's] conduct, including, but not limited to, being incapable of providing consent." The Supreme Court clarified this definition in *State v. Olivio*, 123 *N.J.* 550, 564, 589 *A*.2d 597 (1991) by specifying that the mentally defective person must be "unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another." Thus, as to this count, the inquiry is whether the State presented sufficient evidence for a reasonable jury to conclude that defendants, knowing that M.G. was mentally defective, purposely engaged in sexual penetration while aided or abetted by at least one other person.

The State presented two experts, Doctors Esquilin and Meyerhoff, who expressed their opinion that M.G. was mentally defective under the *Olivio* standard because, although M.G. understood that she was engaging in conduct of a sexual nature, she did not understand that she had the right to refuse. Defendants had

known her since grade school, and thus it was reasonable to infer they were aware of this defect. M.G.'s tennis teacher testified that in 1982 the Archers were among those who called M.G. "stupid" and "a retard." M.G.'s sister and Dawn Lipinski both testified that everyone knew that M.G. was "different."

M.G.'s friends, family, and teachers testified to her inability to say no to any request because she wanted to please people and to her use of sexuality to make friends. Lipinski said she had never heard M.G. say no to any request. M.G.'s sister related an incident that occurred when M.G. was five years old—a group of children, including Kyle and Kevin, persuaded her to eat dog feces—as an example of how easily led she was. M.G.'s mother testified about phone calls of a sexual nature that M.G. received from Christopher Archer. M.G.'s high school guidance counselor testified that after she learned M.G. was engaging in sexual conversations with a group of football players in the cafeteria and had allowed someone to touch her breast in health class, she told M.G. that she had a right not to allow someone to touch her body, but that she did not appear to understand the concept, especially when the person touching her was someone she considered to be a friend.

The State presented ample evidence that all three defendants were aware of M.G.'s acquiescent nature in sexual and other matters and that they had taken advantage of that aspect of her personality in the past. Even if they could not be expected to have labeled her as "mentally defective," they, as reasonable young persons were shown under the circumstances presented to have known that M.G. did not understand that she could say no to a request. This we hold to be sufficient under *N.J.S.A.* 2C:14–2a(5)(b).

■ There was no dispute that vaginal penetration of M.G. occurred, and according to M.G.'s testimony, all three defendants were involved in either preparing, inserting, or trying to insert, either the broom handle or the bat into M.G. while she lay on the couch. That the bat may not have actually entered M.G. is

irrelevant since it touched her vaginal area. *N.J.S.A.* 2C:14–1c. According to M.G.'s testimony, Kyle does not seem to have actually inserted either the bat or broom into her, as he was putting plastic bags and Vaseline over them and then handing them to Kevin and Christopher Archer. However, he would be culpable as a co-conspirator and under the theory of accomplice liability for Kevin's and Christopher Archer's conduct. *N.J.S.A.* 2C:2–6b(4) and c(1)(b).

Under Rule 2:10–1, "the issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." Defendants did not make such a motion before the trial court, and, therefore, we need not consider it. Nonetheless, as is evident from our earlier discussion, we have considered the merits of defendants' arguments in the interest of justice. *State v. Smith,* 262 *N.J.Super.* 487, 511, 621 *A.*2d 493 (App.Div.), *certif. denied,* 134 *N.J.* 476, 634 *A.*2d 523 (1993). We conclude that as to the convictions on all counts other than Count Three, it does not appear "that there was a miscarriage of justice under the law." *R.* 2:10–1.

Quite the contrary, the evidence weighed heavily in favor of the jury's verdicts. Only on the force or coercion count, was there insufficient evidence of the use of force or coercion. On the basis of the permissible evidence presented to the jury, we conclude that the jury could rationally have found that all the elements required to prove the remaining counts on which defendants were convicted were proved beyond a reasonable doubt and that the jury's verdicts were not against the weight of evidence.

## II

Defendants maintain the trial judge did not limit Dr. Burgess's testimony on the RTS to the only appropriate use of the testimony, i.e., to rehabilitate M.G.'s credibility by explaining that delayed reporting and recantation are not inconsistent with a claim of rape. Burgess was allowed to testify that M.G. exhibited RTS.

This, defendants assert, may have persuaded the jury that Burgess believed M.G. had been raped. They also allege error because the judge admitted the event drawings which were not probative and were highly prejudicial in that they had an aura of scientific reliability, and the judge failed to provide the jury with a limiting instruction on the proper use of the drawings. Finally, it is contended the judge erred in refusing to grant defendants' motion for a mistrial or hold a hearing to investigate whether the jurors improperly used the drawings as direct evidence of the alleged assault.

*N.J.R.E.* 702 (formerly *Evid. R.* 56(2)) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

There are three requirements for the admission of expert testimony: (1) it must concern matters "beyond the ken" of the average juror; (2) the scientific theory must be sufficiently reliable (generally accepted in the appropriate profession); and (3) the expert must have sufficient expertise. *State v. Kelly,* 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984).

New Jersey courts have not directly ruled on the admissibility of RTS evidence, however, in *State v. J.Q.,* 130 *N.J.* 554, 581, 617 *A.*2d 1196 (1993), our Supreme Court analogized its ruling on the admissibility of Child Sexual Abuse Accommodation Syndrome ("CSAAS") to the approach followed by other jurisdictions on RTS evidence. In *J.Q., supra,* 130 *N.J.* at 580, 617 *A.*2d 1196, the Court held that because CSAAS "has a limited, therapeutic purpose and not a predictive one," it could not be used as affirmative evidence that molestation had occurred, but could only be used for the limited purpose of explaining why a child's reactions "are not inconsistent with having been molested." In a subsequent child sex abuse case, we explained that

> the role of CSAAS evidence is the other side of the coin of fresh complaint evidence and fulfills the same function, namely, to respond to preconceived but not necessarily valid ideas jurors may have regarding the consistency of the post-assault

conduct of a victim who claims to have been sexually abused with the fact of an actual act of abuse.

*State v. W.L.,* 278 *N.J.Super.* 295, 302, 650 *A.2d* 1035 (App.Div.1995).

The trial judge sought to follow the mandate of *J.Q.* He prohibited Burgess from giving her opinion as to whether M.G. was sexually assaulted, or to testify about other symptoms of the syndrome that she might have exhibited. Only one aspect of his ruling appears unacceptable. He allowed Burgess to testify that M.G. "exhibited the rape trauma syndrome." He stated its use was to help the jury determine credibility "as it may relate to any delay in reporting or partial recantation."

In *J.Q., supra,* 130 *N.J.* at 559, 617 *A.2d* 1196, because the expert was allowed to offer her opinion at trial that the children had been sexually abused, the Court reversed without addressing the issue of whether an expert opinion that someone had exhibited symptoms of the syndrome was also inadmissible. However, in other appeals involving CSAAS, we have indicated that such an opinion would be inadmissible. In *State v. Michaels,* 264 *N.J.Super.* 579, 604, 625 *A.2d* 489 (App.Div.1993), *aff'd,* 136 *N.J.* 299, 642 *A.2d* 1372 (1994), we held it was error for the prosecution to present expert testimony that specific children had demonstrated behavioral indicators "consistent with" those of abused children. In *W.L., supra,* 278 *N.J.Super.* at 303, 650 *A.2d* 1035, we found it plain error for the expert to explain the syndrome by tracking the child's testimony, "underscoring in the jurors' minds the notion that these behaviors were probative of the fact of abuse." In *State v. W.L., Sr.,* 292 *N.J.Super.* 100, 112–18, 678 *A.2d* 312 (App.Div.1996), we held it was error for the expert to testify that she had diagnosed the victim as suffering from post-traumatic stress disorder, which is not inconsistent with a victim of sexual abuse.

The danger of allowing such opinion evidence is explained in *State v. Taylor,* 663 *S.W.2d* 235, 240 (Mo.1984), where the court said that an inherent implication of the term "rape trauma syndrome" is that the syndrome can only be caused by

rape, although in fact the "characteristic symptoms may follow *any* psychologically traumatic event." *Id.* at 238 (quoting *State v. Saldana,* 324 *N.W.*2d 227, 229–30 (Minn.1982)); *see People v. Bledsoe,* 36 *Cal.*3d 236, 203 *Cal.Rptr.* 450, 460, 681 *P.*2d 291, 301 (1984) (improper to permit an expert to "suggest that because the complainant exhibits some of the symptoms of rape trauma syndrome, the victim was therefore raped."). Thus, we hold it was error for the judge to permit Burgess to render an opinion that M.G. exhibited what Burgess calls the RTS. We believe that error had the capacity to taint the jury verdict only as to Count Three, penetration by force or coercion.

The judge did, however, give the jury a limiting instruction before Burgess began offering her opinion. He said that "her testimony is not offered to show one way or the other whether [M.G.] was sexually assaulted ... it's to better help you understand some of the issues so that you can decide what really happened back on March 1st, 1989." In certain cases in which expert evidence was inappropriately offered as affirmative proof that an assault occurred, courts have not reversed when the prosecution had such a strong case that it was not reasonably probable that the evidence affected the result, especially when the trial court gave a proper limiting instruction. *Bledsoe, supra,* 203 *Cal.Rptr.* at 460, 681 *P.*2d at 301; *People v. Coleman,* 48 *Cal.*3d 112, 255 *Cal.Rptr.* 813, 830, 768 *P.*2d 32, 49 (1989), *cert. denied,* 494 *U.S.* 1038, 110 *S.Ct.* 1501, 108 *L.Ed.*2d 635 (1990) (both cases dealing with the issue of consent).

We conclude that on Count Two, charging penetration of a person defendants knew or should have known was mentally defective, the case against defendants was very strong and the evidence that M.G. was suffering from RTS had limited relevance to defendants' guilt. The elements of the crime are 1) penetration; 2) defendant is aided and abetted by one or more other persons; 3) victim is mentally defective; 4) defendant knew or should have known the victim was mentally defective. Defendants did not actively dispute that at least two of the defendants penetrated M.G. Paul Archer testified that Kevin and Christopher

helped M.G. move the broom stick in and out of her vagina. Defendants did dispute whether M.G. was mentally defective and whether they knew or should have known that she was defective. As to these disputed elements, Burgess's testimony on RTS had no relevance. The fact that M.G. may have suffered a trauma is not probative of whether she was mentally defective, that is, whether she had the capacity to consent; nor is it probative of defendants' knowledge of the mental defect.

As to mental defect, the State offered the expert opinion of Dr. Esquilin, a psychologist, and Dr. Meyerhoff, a psychiatrist, that M.G. is mentally deficient in that she is incapable of exercising the right to refuse to engage in sexual conduct. There was clear evidence that these defendants knew or should have known of that mental defect. Numerous witnesses testified that M.G.'s mental condition was apparent within a few minutes of conversation with her and that it was generally known in the community that M.G. was "slow." M.G. testified that she knew Archer since first grade and met Kevin and Kyle in grade school. Moreover, the Archers and Scherzers and M.G. all lived in the same neighborhood. We are, therefore, convinced that the error lacked the ability to change the verdict on either Count Two or the conspiracy count.

Burgess also testified as to M.G.'s event drawings. Although this was error, these drawings had no capacity to prejudice the jury with regard to count two. Burgess testified that M.G. told her that one picture depicted "either Chris or Kevin" inserting the bat and another picture depicted Kevin inserting the broomstick. This testimony did not mislead the jury on the issue of who penetrated M.G. Paul Archer testified that both Christopher and Kevin helped insert the broom stick. Thus, there was no danger that this testimony would have caused the jury to convict Kevin and Christopher of a crime involving penetration, when it otherwise would not have.

## III

Defendants contend that the trial judge's Rape Shield rulings altered the Assignment Judge's original Rape Shield ruling there-

by preventing them from effectively cross-examining the State's witnesses in violation of their Sixth Amendment right of confrontation. They refer specifically to rulings that limited their cross-examination of four witnesses, including Paul Archer, about aspects of M.G.'s sexual history, and a ruling that restricted them from cross-examining Esquilin and Meyerhoff on redacted portions of the Ferraez tapes, on which they had, in part, based their opinion that M.G. was mentally defective.

The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right "to be confronted with the witnesses against them." The right to confront witnesses includes the opportunity for effective cross-examination of the State's witnesses. *Davis v. Alaska,* 415 *U.S.* 308, 315–16, 94 *S.Ct.* 1105, 1110, 39 *L.Ed.*2d 347, 353 (1974). This right, however, is not absolute and may bow to competing interests, such as fairness, reliability, and public policy considerations. *State v. Budis,* 125 *N.J.* 519, 531–32, 593 *A.*2d 784 (1991).

The Rape Shield Law, *N.J.S.A.* 2C:14–7, limits the circumstances under which evidence of a victim's previous sexual conduct may be admitted in prosecutions for sexual assault offenses. Such evidence will not be admitted unless it is "relevant and highly material," meets the requirements of sections (c) and (d) of the statute, and its probative value "substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *N.J.S.A.* 2C:14–7(a).

Sections (c) and (d) specify particular subjects to which evidence of prior sexual conduct may be relevant, but the list is illustrative rather than exhaustive. *State v. W. L., supra,* 278 *N.J.Super.* at 305, 650 *A.*2d 1035. In order to avoid a conflict with the defendant's constitutional right to a fair trial, the trial judge retains the discretion to admit critical defense evidence that is not the subject of sections (c) or (d). *State v. Ross,* 249 *N.J.Super.* 246, 251, 592 *A.*2d 291 (App.Div.1991).

Defendants had at trial identified sixty-nine specific prior sexual acts that they might want to explore. The acts were divided into three groups: thirty were identified in the State experts' reports and grand jury transcripts, twenty-eight derived from the Ferraez tapes, and eleven emerged during defendants' own investigation. The trial judge entered an order detailing which of the sixty-nine sexual acts were admissible. He ruled that twenty-eight of the acts were admissible and four might be "subject to the Court being satisfied regarding the discovery rules." The remaining acts were held inadmissible under *Evid. R.* 4 (now *N.J.R.E.* 403). In a "Statement of Reasons" the judge explained that he would admit sexual conduct evidence to establish that M.G. was not mentally defective because she understood the nature of sexual acts, understood and was able to exercise her right to say 'no,' and had engaged in sex acts with any of the defendants "as relevant to the issue of whether or not M.G. freely and affirmatively assented to any sex acts on March 1, 1989 and whether or not any of the defendants reasonably understood that." However, he would "not allow defendants to introduce evidence of specific instances of M.G.'s sexual conduct to establish her character trait of promiscuity," which he said they wanted to do "so as to permit the jury to infer that she initiated and/or consented to the sex acts with the defendants on March 1, 1989." Nor would he allow defendants "to adduce evidence of M.G.'s reputation in the community for promiscuity or sexual aggressiveness as tending to show that she actually possessed those character traits." He would allow reputation evidence if "relevant to whether any of the defendants knew or should have known that M.G. was mentally defective," but they could not establish that through evidence of specific instances of her sexual conduct.

We find no substantial conflict between the rulings of the two judges. The Assignment Judge ruled on the legal issues based on his generalized knowledge of the types of sexual incidents defendants wanted to present to the jury, whereas the trial judge ruled on individual incidents proffered by defendants. Their rulings were consistent with each other on the law.

■ The trial judge allowed defendants to show that M.G. was sexually knowledgeable and aggressive in her school and neighborhood, as well as with defendants, from which the jury could infer that she might have consented to the acts in the Scherzer basement and that defendants thought she understood sex and her right to say no. He refused to allow defendants to forage in her private life and tell the jury about every sexual incident in her past, when such evidence might focus attention on her mores and prejudice the jury against her, thus deflecting their consideration from defendants' actions. Defendants were given sufficient opportunity to show M.G. was sexually active and aggressive.

The exclusion of evidence is reversible error only if it is critical to the defense, as where there was no other available evidence to demonstrate particular defense issues. *State v. G.S.*, 278 *N.J.Super.* 151, 171–72, 650 *A.*2d 819, (App.Div.1994), *rev'd on other grounds*, 145 *N.J.* 460, 678 *A.*2d 1092 (1996). Here, there was ample opportunity to explore the defense issues through alternative means. The State's experts testified about M.G.'s sexual aggressiveness and the jury heard M.G. tell Ferraez on the November 14, 1989, tape that she had had sex with both of the Scherzers prior to the basement incident. The judge also allowed defendants to explore specific instances when M.G. exposed herself to boys. He ruled defendant would be allowed questioning on M.G.'s sexual activities with the Archers "subject to the Court being satisfied regarding the discovery rules." M.G.'s sexual activities with several other boys was brought out in the Ferraez tapes and through cross-examination of the State's experts. Thus, any prejudice to defendants caused by excluding other testimony about M.G.'s sexual aggressiveness toward specific persons was minimized by the admission of other evidence that went to the same defense issues—consent, M.G.'s mental defectiveness, and defendant's knowledge of her condition. We, therefore, conclude the excluded evidence was not crucial to their defense, but merely cumulative.

■ Defendants also objected to testimony about M.G. attending a dance attended predominantly by black students on the ground that the testimony "was calculated to appeal to the prejudice" of the black jurors. They moved for a mistrial, which the judge properly denied. Race was not an issue in the case and moreover we find nothing prejudicial to defendants arising from this testimony.

■ Defendants also contend that by redacting the Ferraez tapes the court allowed the State to present a one-sided and incomplete version of the facts, and that by prohibiting defendants from cross-examining the State's experts on the unredacted portions of the tapes, which they had reviewed as a follow-up to their evaluations of M.G., the court denied defendants their constitutional right to explore the facts underlying the experts' opinion that M.G. was mentally defective. We disagree.

The scope of the cross-examination of an expert is within the trial court's discretion, and we will not interfere unless clear error and prejudice are shown. *State v. Martini,* 131 *N.J.* 176, 263, 619 *A.*2d 1208 (1993), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995). The September 18, 1992 order included defendants' proffers on twenty-eight incidents from the Ferraez tapes. The judge ruled that only four were admissible. He explained that despite the redactions that would be made in the tapes, there was "going to be plenty left from which the jury will be able to get the full flavor of what M.G. is like, what her capabilities are, and a good deal of the substance, as well, with regard to her sexual background." He stated the fact that the State's experts listened to the unredacted tapes would not preclude defendants from cross-examining them on the numerous incidents relating M.G.'s sexual conduct which he allowed, and testing the validity of their opinions.

Many sexual incidents remained after redaction of the tapes, including M.G. having sex with the Scherzers, getting kicked out of Columbia High School for "messing around," that she has been having sex since she was little and knows everything about sex,

she let the Archers and other guys do things to her, she loved giving sexual favors to Grober, and the like. Clearly, the judge left in the more relevant evidence relating to M.G.'s prior conduct with defendants, as well as enough of her general comments on sex to give the jury a flavor of her enjoyment of sex and her sexual aggressiveness. Much of what the judge deleted from the transcripts involved comments about specific boys.

We are satisfied that the deletions did not result in a one-sided presentation or a sanitization of the facts. It merely cut down on what would have been cumulative evidence and what would have unduly and unnecessarily prejudiced the victim in contravention of the Rape Shield Act. *N.J.S.A.* 2C:14–7. The deleted comments were not necessary for an understanding of the admitted evidence or to put the rest of the tapes in context. Even with the redactions, the jury in reading the tape transcripts inevitably got the message that M.G. enjoyed sex, approached boys and men for sex, and had been having various types of sexual experiences for years. This was what defendants sought to get across through the tapes. That some of the material had to bow to the competing interests inherent in the Rape Shield Law did not negate that effect.

Esquilin's and Meyerhoff's testimony makes it clear that they evaluated M.G. and wrote up their reports before they ever heard the Ferraez tapes. They were later given the tapes to review, and both testified that the tapes only reinforced the opinions expressed in their reports. They mentioned in particular how M.G.'s conversations with Ferraez supported their conclusions that M.G. had an overwhelming desire to please people she considered friends by telling them what she thought they wanted to hear, and how easily she was led. Her sexual aggressiveness was something that Meyerhoff had gleaned from other sources before he ever heard the tapes. Further, under cross-examination, Esquilin said that her opinion would not have changed if she had based it on the tapes as edited. We find no error. *See State v. Clowney,* 299 *N.J.Super.* 1, 15–16, 690 *A.*2d 612 (App.Div.1997).

## IV

█ Defendants contend that the court's imposing the most severe sanction of exclusion of evidence of M.G.'s prior sexual history, for Rape Shield Law discovery violations, deprived them of their constitutional right to a fair trial and to present a defense. The Rape Shield Law, *N.J.S.A.* 2C:14–7(a), provides that when defendants seek to admit evidence of a victim's previous sexual conduct, they

> must apply for an order of the court before the trial or preliminary hearing, except that the court may allow the motion to be made during trial if the court determines that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence.

The Rape Shield Law, "like any other law which attempts to pre-judge relevancy and admissibility, must not be permitted to defeat defendant's sixth amendment right to confront the witnesses against him, and particularly, his right to a fair opportunity for cross-examination." *Ross, supra,* 249 *N.J.Super.* at 251, 592 *A.2d* 291. Thus, in *State v. Budis,* 243 *N.J.Super.* 498, 513, 580 *A.2d* 283 (App.Div.1990), *aff'd,* 125 *N.J.* 519, 593 *A.2d* 784 (1991), we held that the defendant's Sixth Amendment rights outweighed the Rape Shield Law considerations where "crucial defense evidence" on the source of the nine-year-old victim's familiarity with sexual matters would otherwise have been excluded.

█ Under the Rape Shield Law's procedural requirement, as with any discovery rule violation, the trial judge enjoys broad discretion to determine what sanctions, including preclusion of evidence, should be imposed. *See Michigan v. Lucas,* 500 *U.S.* 145, 111 *S.Ct.* 1743, 114 *L.Ed.*2d 205 (1991); *State v. Marshall,* 123 *N.J.* 1, 129–30, 586 *A.2d* 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993) (no error in precluding defense witness not on the witness list from testifying mid-trial because the prosecutor would not have had time to locate rebuttal witnesses); *State v. Toro,* 229 *N.J.Super.* 215, 223, 551 *A.2d* 170 (App.Div.1988), *certif. denied,* 118 *N.J.* 216, 570 *A.2d* 973 (1989), overruled on other grounds by *State v. Velez,* 119 *N.J.* 185, 187, 574 *A.2d* 445 (1990) (trial court did not abuse discretion in

permitting State's expert witness to testify despite failure to notify defendant about his testimony before trial); *cf. State v. Caffee,* 220 *N.J.Super.* 34, 37, 531 *A.*2d 378 (App.Div.1987).

In *N.J.S.A.* 2C:14–7, our Legislature has given rape victims heightened protection against surprise, harassment, and unnecessary invasions of privacy. This is a legitimate goal according to the United States Supreme Court. *Lucas, supra,* 500 *U.S.* at 150, 111 *S.Ct.* at 1746, 114 *L.Ed.*2d at 212. Whether exclusion is an appropriate sanction, depends on the balancing of relevant factors by the courts. *See Fendler v. Goldsmith,* 728 *F.*2d 1181, 1187 (9th Cir.1983) and *Caffee, supra,* 220 *N.J.Super.* at 37, 531 *A.*2d 378. Those factors include: (1) was defendants' discovery violation due to willful misconduct (e.g., was it a tactical decision); (2) would a mid-trial proffer have caused unfair surprise to the State; (3) were there alternatives to exclusion (e.g., recess, continuance, prosecutorial comment on discovery violation) and (4) the impact of witness preclusion on the outcome of the trial. *Fendler, supra,* 728 *F.*2d at 1187–88; *Caffee, supra,* 220 *N.J.Super.* at 37, 531 *A.*2d 378.

Here, the trial judge considered defense counsel's explanations and made his ruling on the merits. Although the judge did not articulate his findings as to whether defendants' late proffer was willful, the prejudice that would inure to the State and the victim if the evidence was admitted is readily apparent. We conclude that the preclusion order does not require reversal. The judge admitted almost half of the seventy of the instances proffered by defendants, resulting in the jury hearing extensive testimony about M.G.'s sexual aggressiveness. The jurors heard that M.G. had engaged in sexual experimentation since the age of eleven or twelve, had approached a group of athletes in the high school cafeteria and made sexual comments, had been put on birth control pills by her mother, and much more. Even if the exclusions ordered on procedural grounds constituted error, it was harmless at best. *R.* 2:10–2.

## V

Defendants argue that the judge erred in admitting detailed fresh complaint testimony of Jennifer Lipinski and that the judge failed to establish whether M.G.'s statement to Lipinski was spontaneous and voluntary. In addition, it is argued that the fresh complaint testimony of the swimming instructor contained too much detail.

The fresh complaint doctrine permits the State to introduce evidence that a victim of a sexual assault spontaneously complained of the crime within a reasonable amount of time to someone the victim would normally turn to for help and advice. *State v. Hill,* 121 *N.J.* 150, 163, 578 *A.2d* 370 (1990); *State v. Tirone,* 64 *N.J.* 222, 226, 314 *A.2d* 601 (1974). The rationale of the doctrine is that allowing the testimony will forestall a jury from assuming that no evidence of complaint was introduced because no complaint was made. *State v. Balles,* 47 *N.J.* 331, 338, 221 *A.2d* 1 (1966), *cert. denied and appeal dismissed,* 388 *U.S.* 461, 87 *S.Ct.* 2120, 18 *L.Ed.*2d 1321 (1967). Because the evidence is admitted to show only that a complaint was made, no details of the complaint are admissible. *State v. Hill, supra,* 121 *N.J.* at 163, 578 *A.2d* 370. Our Supreme Court reaffirmed the viability of the fresh complaint doctrine in the companion cases of *State v. Hill, supra,* 121 N.J. at 165, 578 *A.2d* 370, and *State v. Bethune,* 121 *N.J.* 137, 578 *A.2d* 364 (1990). Fresh complaint evidence is admitted for the limited purpose of showing that a complaint was made; the evidence is not permitted as corroboration of the alleged offense. *State v. J.S.,* 222 *N.J.Super.* 247, 256–57, 536 *A.2d* 769 (App.Div.), *certif. denied,* 111 *N.J.* 588, 589, 546 *A.2d* 513 (1988). Thus, details of the offense should be confined to those minimally necessary to identify the subject matter of the complaint. *Id.* at 257, 536 *A.2d* 769.

The State offered Lipinski, a friend of M.G.'s, as a fresh complaint witness. The judge cautioned the State that he would not permit it to elicit details of what M.G. told Lipinski of the incident except those details which identified the incident. He

particularly forbade any testimony that M.G. told Lipinski M.G. was tricked into going into the house. The judge asked the prosecutor to explain to Lipinski the limits placed on her testimony. However, despite the judge's ruling, the prosecutor asked a question that caused the judge to admonish the prosecutor because the question asked was "almost designed to get that kind of an answer." The witness had responded that M.G. said she was coerced into going down there and forced into it. Nonetheless, the prosecutor continued:

Q. Miss Lipinski, focusing your attention just on what [M.G.] said to you about what had happened to her in the Scherzer's basement, did [she] tell you that they made her remove her pants?

A. Yes she did.

Q. And lift up her shirt?

A. Yes.

Q. And had a little bat with Vaseline?

A. Um-hum.

Q. And they stuck it up her?

A. Yes.

At the conclusion of Lipinski's testimony, the judge instructed the jury as to the limited use it could make of the fresh complaint testimony. Defendants objected to Lipinski's testimony as being too detailed and to the judge's instruction as presuming that there had been sexual abuse. We find the admission of the detailed testimony to be improper, but in view of our earlier ruling and the curative instruction of the trial judge, we find it harmless.

In *State v. Bethune, supra,* 121 *N.J.* 137, 578 *A.*2d 364, our Supreme Court found overly detailed fresh complaint testimony to be harmless error. There, defendant was convicted of two counts of aggravated sexual assault of a five-year-old child. *Id.* at 139–41, 578 *A.*2d 364. At trial, a hospital social worker testified that the child told her defendant had penetrated her ten times. *Id.* at 140, 578 *A.*2d 364. The testimony was admitted under the fresh complaint rule. *Id.* at 141, 578 *A.*2d 364. The Court acknowledged that the social worker's testimony included too much detail because it referred to the specific act of penetration and to the

child's statement that she had been assaulted many times. *Id.* at 147, 578 *A.*2d 364. Nonetheless, the Court did not find this error to be reversible. *Ibid.*

Clearly, Lipinski's testimony was caused by the prosecutor to contain more detail than was necessary to identify the incident. Her reference to M.G. being forced to remove her clothing and engage in the sexual acts, exceeded what was necessary to identify the complaint. Significantly, M.G. did not testify that defendants forced her to remove her clothing to engage in sexual acts. Physical force or coercion is one of the elements of Count Three of the indictment, aggravated sexual assault by force or coercion, *N.J.S.A.* 2C:14–2a(5)(a), and it is remarkably absent from any other source at the trial.

Although the prosecutor acted improperly in compelling this overly detailed testimony, the judge immediately instructed the jury following the testimony and thereby minimized the risk of prejudice to defendants. The judge unequivocally instructed the jury that it was not to use the fresh complaint testimony as evidence that the sexual assault occurred or to support the credibility of M.G. Courts must rely upon a jury's ability and willingness to follow limiting instructions. *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969). All factors considered, we do not perceive that the error was capable of tainting any count other than that pertaining to Count Three.

Defendants further contend that the judge erred in not holding a hearing on whether M.G.'s statement to Lipinski was in response to coercive questioning. *See State v. Hill, supra,* 121 *N.J.* at 163, 578 *A.*2d 370. However, defendants never raised this objection at trial, as defendants' argument on appeal is different from their argument at trial, the plain error standard of review is appropriate. *State v. Bey,* 112 *N.J.* 45, 63, 548 *A.*2d 846 (1988); *R.* 2:10–2. In any event, the circumstances of M.G.'s statement to Lipinski indicate that even if Lipinski asked M.G. some questions, these questions were non-coercive. *See State v. Hill, supra,* 121 *N.J.* at 167, 578 *A.*2d 370.

Defendants' contention that the swimming instructor's fresh complaint testimony contained too much detail about the sexual assault is without merit. *R.* 2:11–3(e)(2). In addition, as with Lipinski's testimony, we find no cause for reversal.

It is also argued that it was error to allow M.G.'s swimming instructor, to whom M.G. first reported the conduct, to testify that "the main thing she [M.G.] wanted to know was how can she say no if the incidents happen again." Over defendant's objection, the judge admitted this testimony under the exception to the hearsay rule for statements of the mental condition of the declarant, *Evid. R.* 63(12) (now *N.J.R.E.* 803(c)(3)).

The judge found that the statement was made in good faith and within a reasonable time after the crime. He found that it could be inferred that the statement which reflected M.G.'s state of mind three days after the incident reflected her state of mind on the day of the crime. As M.G.'s mental condition was a genuine issue in the case, he reasoned that whether M.G. had the ability to say "no" was relevant to that issue.

*N.J.R.E.* 803(c)(3) provides that a statement of mental condition is admissible hearsay:

> Then existing mental, emotional, or physical condition. A statement made in good faith of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Defendants argue the relevant issue was M.G.'s state of mind at the time of the crime, not her state of mind three days after the crime. They argue that under *N.J.R.E.* 803(c)(3) hearsay may not be admitted about a declarant's current state of mind to show declarant's past state of mind.

In *In re Spiegelglass' Estate*, 48 *N.J.Super.* 265, 267, 137 *A.*2d 440 (App.Div.), *certif. denied*, 26 *N.J.* 302, 139 *A.*2d 588 (1958), the testator scratched out certain names in his will. After his death, his grandchildren challenged the will contending that it had been

revoked. *Ibid.* The trial court admitted the testimony of the testator's lawyer as to a conversation he had with the testator when the testator delivered the altered will, wherein the testator told the lawyer he did not want to revoke the will but only wanted to prevent his son's children from inheriting. *Id.* at 270, 137 *A*.2d 440.

We held the conversation a contemporaneous declaration of mental state. *Id.* at 271, 137 *A*.2d 440. We noted "a certain probability of continuity, in a person's state of mind," and reasoned that this continuity was the foundation for admitting evidence of the testator's state of mind at the time he delivered the will as it tended to show what his state of mind was when he altered the will. *Id.* at 272, 137 *A*.2d 440. However, we specifically provided that

> where a declaration is offered in order to show a previous state of mind, the court is invested with a discretion to refuse to admit the evidence where because of the circumstances and the interval between the time of the declaration and the previous time referred to, it concludes that there is no reasonable basis for finding such a continuity.
>
> [*Id.* at 272–73, 137 *A*.2d 440.]

Here, the judge did not abuse his discretion in finding that M.G.'s declaration of her mental state three days after the crime was probative of her mental state at the time of the crime. This was a relatively short interval and no litigation was anticipated at the time. M.G. did not appear to have an incentive to lie about her state of mind. M.G.'s question was how she could avoid such an incident in the future. This reflected her then-existing concern about refusing unwanted sexual encounters, and was not a recollection of what she was thinking or feeling at the time of the incident. Thus, the statement did not fall within the "memory or belief" exception to admissibility of *N.J.R.E.* 803(c)(3).

Defendants also assert it was error to permit a school administrator to testify as to where they attended school when he did not have personal knowledge or produce the actual school records. Any error in this regard was harmless, even if *N.J.R.E.* 1002 and

1004, the best evidence rule was violated. *R.* 2:10–2. No further discussion of the issue is warranted. *R.* 2:11–3(e)(2).

It is contended that the trial court erred when it admitted into evidence, over objection, a high school yearbook photograph of Kyle holding a baseball bat, as well as a photograph of M.G. and Ferraez, which was displayed on a TV screen while the jury listened to the Ferraez tapes being played. We find these contentions to be so lacking in merit as to not require extended comment. *Id.* The trial judge has broad discretion in determining the admissibility of potentially prejudicial evidence. *State v. Wilson,* 135 *N.J.* 4, 20, 637 *A.*2d 1237 (1994). Absent a clear abuse of that discretion, we will not overturn a decision on appeal; the trial court's decision must be so wide of the mark that a manifest denial of justice resulted. *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982). Such an abuse is found if the prejudicial evidence would be such as to divert jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence. *State v. Moore,* 122 *N.J.* 420, 467, 585 *A.*2d 864 (1991). We find no abuse of discretion in these matters.

It is also asserted the judge erred in admitting evidence that the two Scherzers had persuaded M.G. to eat dog feces and mud pies when she was five years old and erred in denying their motion for a mistrial. They maintain that any probative value was outweighed by the undue prejudicial effect. The trial judge noted that the dog feces incident was "was offered primarily to show knowledge on the part of two of the defendants who were present, as to her mental state." The judge did not find that any of the related testimony was "so inherently prejudicial" as to warrant the relief requested. The judge relied on the test for mental defectiveness articulated in *Olivio, supra,* 123 *N.J.* at 550, 589 *A.*2d 597. He reasoned that to prove M.G. did not know that she had the right to say no to sex, the State could offer testimony on her compliant nature, and that the dog feces and mud pie proofs were relevant to that issue. He did not find the evidence to be "too

attenuated in time or too prejudicial when balanced against its probative value," under *Evid. R.* 4 (now *N.J.R.E.* 403).

Significantly, upon defendants' request, he gave the jury the following limiting instruction:

[Y]ou heard some testimony concerning [M.G.] being tricked into eating some dog feces by some neighborhood children. You may recall, the testimony was that her sister ... stated that she came upon the scene, found out what had happened, took [M.G.] home and told their mother. You also heard some testimony that two of the defendants in this case knew about that incident, Kyle and Kevin Scherzer. Keep in mind, please, you did not hear any testimony to suggest that Kevin or Kyle Scherzer were involved in that incident. But that they did learn of it. You heard this testimony for two very particular reasons. First of all, the State offered it ... on the issue of [M.G.]'s mental acts or keeping in mind that this was when she was age five. And also to show what any of the defendants might have known about [M.G.]'s mental abilities.

With regard to that second prong, thought, their knowledge, remember, that testimony is limited only to Kevin and Kyle Scherzer, since there was only testimony that those two persons knew about this incident and you may not consider that evidence with regard to either of the other two defendants.

Under *N.J.S.A.* 2C:14–2a(5)(b), a person is guilty of sexual assault if "he commits an act of sexual penetration" and the "victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated." In *Olivio, supra,* 123 *N.J.* at 564, 589 *A.2d* 597, the Court elaborated on the Code's definition of "mentally defective," *N.J.S.A.* 2C:14–1(h), holding that a person is mentally defective "if, at the time of sexual activity, the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another."

Under *N.J.R.E.* 403, the trial court has broad discretion in determining whether the probative value of evidence is significantly outweighed by the risk of undue prejudice. *State v. Sands,* 76 *N.J.* 127, 144, 386 *A.2d* 378 (1978), *modified on other grounds, State v. Brunson,* 132 *N.J.* 377, 625 *A.2d* 1085 (1993). Only where there has been a "clear error of judgment" should a *N.J.R.E.* 403 determination be overturned. *State v. Koedatich,* 112 *N.J.* 225, 313, 548 *A.2d* 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813,

102 *L.Ed.*2d 803 (1989). We cannot say that the evidence was so inflammatory that it diverted the jurors' minds from the issues of the case, given the judge's limiting instruction. We find no abuse of discretion in admitting the evidence.

## VI

Defendants maintain it was error to deny their motion to dismiss the indictment based on the prosecutor's failure to present exculpatory evidence to the grand jury and the presentation of incompetent and prejudicial evidence. The exculpatory evidence referred to is the juvenile waiver hearing testimony of two defense experts that M.G. was not mentally defective and that defendants could not have been expected to know about her mental condition. The alleged incompetent evidence is Burgess's testimony on the RTS and on whether M.G. was coerced into the sexual acts. The prejudicial evidence relates to defendants' alleged prior bad acts of voyeurism and tricking M.G. into eating dog feces when she was five years old.

In denying the motion, the Assignment Judge concluded that "[s]ubstantial evidence" was presented on every element of the charged crimes, the prosecutor's presentation was neither "overly zealous" nor "fundamentally flawed or unfair," the prosecutor's conduct "did not amount to an intentional subversion of the grand jury process" or "clearly infringe on the grand jury's independence," and "the errors were not likely to produce an unjust result, nor was the actual result unjust."

We agree and also point out that our conclusion as to the State's failure to sustain Count Three at trial moots certain aspects of defendants' argument. We find each of the contentions of the various defendants as to defects in the grand jury proceeding to be without sufficient merit to warrant further discussion. *R.* 2:11-3(e)(2).

*State v. Hogan,* 144 *N.J.* 216, 237, 676 *A.*2d 533 (1996), holds that prosecutors have a duty to present the grand jury with

exculpatory evidence only in the "exceptional" case where the evidence "directly negates a prospective defendant's guilt" and is "clearly exculpatory." The grand jury is an accusatory rather than an adjudicative body, and its role is to decide whether a criminal proceeding should be commenced. *Id.* at 235, 676 *A.*2d 533. While the prosecutor's "sole evidential obligation is to present a prima facie case that the accused has committed a crime," the prosecutor may not deceive the grand jury by telling a "half-truth," thereby presenting a distorted version of the facts, or denying access to evidence that is "credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that the State has not made out a *prima facie* case against the accused." *Id.* at 236, 676 *A.*2d 533.

The first requirement, that the evidence must directly negate the accused's guilt, is satisfied if it refutes an element of the crime. *Id.* at 237, 676 *A.*2d 533. The second, that the evidence must be clearly exculpatory, requires the evidence to be analyzed "in the context of the nature and source of the evidence, and the strength of the State's case." *Ibid.*

At the juvenile waiver hearings, a defense expert testified that M.G. was capable of understanding the nature of her conduct and of consenting to sex, and that the average seventeen-year-old would not be able to tell whether a person was six points below the "borderline normal" I.Q. level, as M.G. was. A second defense expert testified that Christopher Archer would not be able to tell that M.G. was mildly mentally retarded as opposed to just "slow." The prosecutor did not provide the grand jury with this information, instead presenting only the testimony of the State's experts, Esquilin, Meyerhoff, and Burgess.

The prosecutor had no obligation to present the grand jury with the testimony of defense experts thereby requiring the grand jury to make a credibility judgment. *Hogan, supra,* 144 *N.J.* at 238, 676 *A.*2d 533. Although the testimony of the defense experts would have directly negated an element of the crime defendants were accused of, it was not clearly exculpatory. *Ibid.*

Thus, the prosecutor's failure to present the evidence did not warrant dismissal of the indictment. Moreover, the Family Part judge who heard the defense experts' waiver hearing testimony found probable cause to believe that M.G. was mentally defective and that the defendants knew or should have known it. *State in the Interest of B.G., supra,* 247 *N.J.Super.* at 421, 589 *A.*2d 637.

■ An indictment that appears sufficient on its face will not be dismissed as long as there is at least "some evidence" as to each element of the State's prima facie case. *State v. Vasky,* 218 *N.J.Super.* 487, 491, 528 *A.*2d 61 (App.Div.1987). As long as "some evidence" on each of the elements of the offenses is presented and there is nothing that detracted from the fairness of the grand jury proceeding, the indictment should stand. *Id.* at 491, 528 *A.*2d 61; *State v. Engel,* 249 *N.J.Super.* 336, 360, 592 *A.*2d 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991). The grand jury heard M.G.'s own version of the events, as well as the testimony of several of the young men who were in the basement during the events. There was sufficient evidence to support each element of the offenses found in the indictments.

■ Defendants point out that the prosecutor elicited grand jury testimony from Burgess that she believed M.G. was "coerced" by defendants into engaging in sex acts, testimony we have noted was inadmissible. Again, this testimony before the grand jury does not warrant dismissal of the indictment and, in any event, we have concluded that Count Three, penetration by force or coercion, was not proven beyond a reasonable doubt.

■ Regarding defendants' contention that highly prejudicial prior bad acts evidence presented to the grand jury warranted dismissal of the indictment, we noted that an indictment will not be dismissed merely because hearsay or highly prejudicial evidence was heard by the grand jury. *State v. Schmidt,* 213 *N.J.Super.* 576, 584, 517 *A.*2d 1226 (App.Div.1986), *rev'd on other grounds,* 110 *N.J.* 258, 540 *A.*2d 1256 (1988). It cannot be said that on balance the grand jury process itself was shown to have

been unfair. *Vasky, supra,* 218 *N.J.Super.* at 491, 528 *A.*2d 61; *Engel, supra,* 249 *N.J.Super.* at 360, 592 *A.*2d 572.

■ It is further asserted the prosecutor committed misconduct by obtaining indictments of two potential defense witnesses, Ferraez and Richard Childs, thereby interfering with defendants' right to compulsory process. Their motion to dismiss the indictment on these grounds was denied by the Assignment Judge in June 1992, and we denied leave to appeal.

Ferraez secretly taped conversations between herself and M.G. at the request of Childs, a defense investigator. The taped conversation of November 14, 1989, took place the day before M.G. testified before the grand jury. On that tape, Ferraez asked M.G. whether she was going to court the next day, and repeatedly questioned M.G. about what she planned to say.

On May 15, 1990, the prosecutor had the grand jury consider charges against Ferraez for witness tampering, *N.J.S.A.* 2C:28–5(a), and obstruction of governmental function, *N.J.S.A.* 2C:29–1. The prosecutor also caused the grand jury to consider charges against Childs for tampering with or fabricating physical evidence, *N.J.S.A.* 2C:28–6. The grand jury indicted Ferraez and apparently also charged Childs. The prosecutor, however, then asked the grand jury to withdraw the indictment against Childs, which it did. Around January 1992, Ferraez was accepted into the pretrial intervention program and required to complete a six-month term.

A defendant's right to compulsory process for obtaining witnesses in his or her favor is guaranteed by the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. *State v. Fort,* 101 *N.J.* 123, 128, 501 *A.*2d 140 (1985). Where the State has improperly interfered with a defense witness, the federal courts have reversed the conviction on Sixth Amendment grounds. *Id.* at 129, 501 *A.*2d 140. For example, in *United States v. Morrison,* 535 *F.*2d 223, 226–28 (3d Cir.1976), relied upon by defendants, the court reversed defendant's conviction where a prosecutor repeatedly warned defen-

dant's key witness before trial that she might be charged with perjury if she testified on defendant's behalf.

Here, there is no evidence the prosecutor threatened either Ferraez or Childs with prosecution if they testified or cooperated with the defense. Defendants elected not to call Ferraez or Childs to testify. Thus, there is no basis on which to conclude that at the time of trial these witnesses would have refused to testify had they been called. Relying on *State v. Fort, supra,* 101 *N.J.* at 131, 501 *A.*2d 140, it is urged that the defense's decision not to call Ferraez and Childs should not foreclose this argument on appeal. Even accepting defendants' right to raise the issue, we find no basis for relief. There was no promise extracted by the State from the witnesses not to testify. Ferraez and Childs could have testified without jeopardizing any plea agreement and might have testified if given the chance.

More importantly, "a prosecutor is vested with broad discretionary powers ... to prosecute an individual whom he has probable cause to believe has violated the law." *State v. Hermann,* 80 *N.J.* 122, 127, 402 *A.*2d 236 (1979). Although that discretion is not absolute, it may be reviewed only for arbitrariness or abuse. *Ibid.* A prosecutor has an obligation to obtain indictments and, indeed, a prosecutor's willful failure to prosecute a crime may sometimes be unlawful. *State v. Winne,* 12 *N.J.* 152, 174–75, 96 *A.*2d 63 (1953).

As the Assignment Judge found, the prosecutor's decision to seek an indictment of Ferraez was not arbitrary or an abuse-of discretion. Ferraez was indicted for obstructing and witness tampering. *See N.J.S.A.* 2C:29–1 and *N.J.S.A.* 2C:28–5(a). The tapes provided sufficient probable cause to indict. The content and the timing of the conversation, the day before M.G.'s grand jury testimony, raised a reasonable inference that Ferraez was attempting to cause M.G. either to withhold her testimony from the grand jury or to bend her testimony to indicate she had fun and consented to what took place.

As to the Childs indictment, the prosecutor asked the jury to withdraw it, apparently believing that the State did not have sufficient evidence to charge the crime of tampering with physical evidence. *See N.J.S.A.* 2C:28–6. A withdrawn indictment cannot be said to be intimidating. Nor are we told what Childs's testimony would have been or how it would have been useful to defendants. We, therefore, conclude the prosecutor did not improperly deprive defendants of compulsory process by obtaining the indictments of Ferraez and Childs.

## VII

Defendants claim that their convictions must be reversed because the State withheld exculpatory discovery it was required to disclose under *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963). The *Brady* violations alleged were failing to disclose: A) material relating to Peter Quigley's and Paul Archer's admission into PTI; B) that a State expert psychologist, Dr. Esquilin, had treated M.G. in a private capacity; C) that M.G. attended Sheila Byron's wedding; D) notes taken by First Assistant Prosecutor Francese during a meeting with M.G.'s mother; E) notes taken by assistant prosecutors during two interviews of Ferraez; F) State expert Dr. Meyerhoff's billing records; G) Dr. Burgess's impressions of M.G.'s trial testimony; H) M.G.'s medical records; I) a witness's mother's volunteer work for a rape crisis center; J) miscellaneous information regarding Dr. Esquilin; and K) Dr. Esquilin's previous work for the Essex County Prosecutor's Office.

Under *Brady,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 *S.Ct.* at 1196–97, 10 *L.Ed.*2d at 218 (emphasis added). It is well-established that "[i]mpeachment evidence, ... as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley,* 473 *U.S.* 667, 676, 105 *S.Ct.* 3375, 3380, 87 *L.Ed.*2d 481,

490 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682, 105 *S.Ct.* at 3383, 87 *L.Ed.*2d at 494. In *State v. Marshall*, 148 *N.J.* 89, 155–56, 690 *A.*2d 1 (1997), our Supreme Court adopted the *Bagley* standard of materiality. *See State v. Landano*, 271 *N.J.Super.* 1, 32–36, 637 *A.*2d 1270 (App. Div.), *certif. denied*, 137 *N.J.* 164, 644 *A.*2d 612 (1994).

We need not discuss the specific *Brady* violations alleged, as we are completely satisfied that the judge properly handled each of the discovery violations and fashioned remedies sufficient to ensure that defendants' due process rights were not contravened. *See United States v. Johnson*, 816 *F.*2d 918, 924 (3d Cir.1987); *United States v. Peters*, 732 *F.*2d 1004, 1008–09 (1st Cir.1984); *Logan v. Vaughn*, 890 *F.Supp.* 427, 430–31 (E.D.Pa.1995). The delays in disclosure cannot be said to have affected the outcome of the trial because defendants were able to effectively use the information.

 Regarding Detective Byron's knowledge that M.G. and her mother appeared uninvited at Byron's wedding ceremony, while we must attribute such knowledge to the State, we agree with the trial judge's determination that there is no possibility that the undisclosed information could have affected the verdict. "Evidence that is merely cumulative does not create a reasonable possibility that the verdict would have been affected." *State v. Carter, supra*, 91 *N.J.* at 114, 449 *A.*2d 1280.

 Additionally, we conclude that even when viewed cumulatively, the *Brady* violations were without sufficient effect to require reversal. *Kyles v. Whitley*, 514 *U.S.* 419, 472–73, 115 *S.Ct.* 1555, 1558, 131 *L.Ed.*2d 490, 507 (1995). The discovery violations viewed in the aggregate fall far short of being material. Most of the instances defendants complain of concern evidence which was ultimately made available during trial and thus they had the opportunity to use it. The only information which came to light

after trial was M.G.'s attendance at Byron's wedding. These violations whether viewed "item-by-item" or in the aggregate had no capacity to bring about a different result. *Ibid.*

## VIII

Defendants contend the prosecutor engaged in a pattern of misconduct during the evidentiary portion of the trial which deprived defendants of their right to a fair trial. They complain of the prosecutor's A) use of demonstrative and replica evidence; B) reference to defendant Archer being given *Miranda* warnings; C) questions and comments during the State's cross-examination of Paul Archer; D) cross-examination of Nasello–Roberts, a lab technician; E) cross-examination of Paul Archer's attorney; F) a question during the direct examination of Dr. Burgess; and G) statement that a trial is not a search for the truth.

The primary duty of a prosecutor is not to obtain a conviction but to see that justice is done, and therefore, a prosecutor should refrain from improper methods calculated to produce a wrongful conviction. *State v. Farrell,* 61 *N.J.* 99, 104–05, 293 *A.*2d 176 (1972). Prosecutorial misconduct, nonetheless, will not warrant reversal unless the conduct was so egregious so as to deprive defendant of a fair trial. *State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987), *denial of habeas corpus aff'd,* 983 *F.*2d 1215 (3d Cir.1992), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993). The determination of whether such misconduct was prejudicial and denied defendant a fair trial must take into account the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred. *State v. Marshall, supra,* 123 *N.J.* at 153, 586 *A.*2d 85. If counsel makes no objection, the remarks usually will not be considered prejudicial. *State v. Ramseur, supra,* 106 *N.J.* at 323, 524 *A.*2d 188.

The State moved to admit replicas of the bat and broom used in the incident with M.G. M.G. said the broom was identical to the one used except that the original broomstick was

fire engine red. She picked a red paint which she said was the color of the actual broomstick and this was presented at trial together with a "fungo" baseball bat she said was identical to the one used in the incident. At trial, Paul Archer testified that the replica bat and broom looked like the bat and broom used in the attack. Rulings on the admission of demonstrative evidence are within the discretion of the trial judge. *Wimberly v. City of Paterson,* 75 *N.J.Super.* 584, 608, 183 *A.*2d 691 (App.Div.), *certif. denied,* 38 *N.J.* 340, 184 *A.*2d 652 (1962). Defendants claimed at trial that the replicas were unreliable because they were selected just before trial, some three and one-half years after the crime. They also argued that the objects were unduly prejudicial. The trial judge admitted the replicas, reasoning the items would help the jury understand the testimony more clearly, and that they were not inherently inflammatory because they were everyday household items. In his final jury instruction, he noted: "[T]wo of the exhibits, S–61, a replica broom and S–62, a replica bat are replicas, they are not alleged to be the actual broom and the actual bat that was alleged to have been used on March 1, 1989."

There is nothing inherently improper in the use of demonstrative or illustrative evidence. In *State v. Mayberry,* 52 *N.J.* 413, 435–36, 245 *A.*2d 481 (1968), *cert. denied,* 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969), the Court found no error or prejudice in the admission of a gun "very similar" to the murder weapon, which was not recovered. Likewise, in *State v. Ford,* 79 *N.J.* 136, 398 *A.*2d 95 (1979), the trial judge was found not to have abused his discretion in admitting a gun similar to the one used in the armed robbery.

Here, the trial judge was well within his discretion in admitting the replicas. The State's investigator testified as to how the replicas were chosen by M.G. and the judge instructed the jury that the objects were replicas. The bat and broom allowed the jury to understand the testimony more clearly. As the judge observed, as common household items they were not inherently inflammatory.

During the cross-examination of Paul Archer, the prosecutor produced two miniature bats, because initially, the witness had given a statement to the police that the bat which had been inserted into M.G.'s vagina was a miniature, twelve-inch bat. At trial, he admitted he lied in his initial statement and that a full-length fungo bat had been used. Therefore, over defense objection, the judge permitted the prosecution to ask the witness to compare the miniature bat to the replica of the fungo bat. The miniature bats and the comparison were relevant and not unduly prejudicial. The testimony concerning the bats made it clear that these were not the type of bats used and thus there was little chance of jury confusion. We find no abuse of discretion in this ruling.

The prosecutor, over defense objection, showed Paul Archer a beer bottle during cross-examination, and asked: "Mr. Archer, would you agree that for a young woman to put this sharp metal cap into her vagina, it would be a rather crazy thing to do?" The court sustained the defendants' objection. We find no reversible error based on these events. *R.* 2:11–3(e)(2). We also find no error in the prosecutor's use of a clock during the cross-examination of Paul Archer in order to demonstrate and verify the time intervals Kevin Scherzer held the broomstick in M.G.'s vagina. Defendants' objection that the probative value of the evidence was substantially outweighed by the danger of undue prejudice, was properly overruled. The demonstration gave the jury a realistic idea of how long the time was. The prosecutor did not act improperly.

It is also urged that the prosecutor's reference at trial to Christopher Archer being given *Miranda* warnings (*Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966)) during the investigation of this crime was prosecutorial misconduct. We are not told why the prosecutor's reference constitutes misconduct, but assume it is seen as an indirect comment upon his failure to make a statement, as his brother, Paul, had done. An accused has the right to remain silent and no negative inference can be

drawn against him or her for maintaining that silence. · *State v. Deatore*, 70 *N.J.* 100, 114–15, 358 *A.*2d 163 (1976). Further, the State may not comment to the jury upon that silence. *Ibid.* Here, the prosecutor mentioned only the warnings not any lack of statement. For this to be a comment upon silence, the jury would have to make a connection between the *Miranda* warnings and the fact that they had heard nothing about Christopher Archer giving a statement. However, Paul had already testified on direct that he and Christopher were questioned by the police. We see no merit to this allegation of prosecutorial misconduct during the cross-examination of Paul. *R.* 2:11–3(e)(2).

We have also carefully considered the assertions of impropriety in the questions the State asked of the defense witness who was a laboratory technician with the New Jersey State Police Lab. We find no error and in any event, the judge's rulings on the questions precludes any notion that the questioning was so egregious as to deprive defendants of a fair trial. *State v. Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188.

 Misconduct is also alleged in the State's cross-examination of the attorney representing Paul Archer, who was called as a defense witness. He testified on direct about his efforts to get his client admitted into the pretrial intervention program and about his guilty plea hearing. He was asked on direct examination about the guilty plea colloquy in which he asked his client whether Kevin put the broomstick into M.G.'s vagina, and Paul replied "yes." This was contrary to Paul's trial testimony in which he claimed that M.G. placed the broomstick into her vagina herself while Kevin and Christopher, holding the bristle end, helped her move the broom in and out. The attorney stated his colloquy question to Paul had been a mistake.

On cross-examination, the prosecutor asked: "Isn't it a fact" that "your client told you this time and time and time again, correct?" The attorney answered: "I can't speak about attorney/client privileges." The objection was sustained on the ground the question called for an answer which impinged upon the

attorney-client privilege. On recross, the prosecutor inquired: "Following up, your client never said 'I am innocent, I am going to trial,' he never said that, did he?" The judge again sustained the objection.

We will not explore whether on direct examination defendants opened the door to this line of inquiry; rather we will assume the prosecutor improperly sought to have the attorney disclose privileged communications. *See N.J.R.E.* 504 (then *Evid. R.* 26); *In re Nackson,* 221 *N.J.Super.* 187, 194, 534 *A.2d* 65 (App.Div.1987), aff'd, 114 *N.J.* 527, 555 *A.2d* 1101 (1989). Nonetheless, any misconduct had no capacity to prejudice the trial. The judge sustained defense objections to the questions, and therefore, no privileged material was brought before the jury. The defense asked that no curative instruction be given, however, the final jury instructions included the following: "When I have sustained an objection, remember, the question of the attorney to which there was no answer because I sustained an objection should be disregarded by you. Draw no inference in the wording of it and don't speculate as to what the answer might have been." We can assume that the jury faithfully followed this instruction. *State v. Manley, supra,* 54 *N.J.* at 271, 255 *A.2d* 193.

 It is also urged that the prosecutor committed misconduct by asking during direct examination, in violation of the judge's RTS ruling: "Now, Dr. Burgess, in the description of.... [M.G.] in these particular—that particular drawing, did she, at any time, depict that particular incident by using the term.... [fun]?" Burgess answered: "No, she did not." Defendants' objection was sustained and the judge repeated his earlier ruling that Burgess could testify only about how the drawings buttressed her opinion that M.G. suffered from RTS, not about M.G.'s comments on the particular events. At the request of defendants, the judge struck Burgess's answer from the record, without informing the jury for fear of highlighting the matter. He gave no curative instruction because defendants' feared such an instruction would "compound the damage." The judge found no willful misconduct on the part

of the State. He said he did not apply his RTS rulings "chapter and verse through every question so, I don't know that this was in direct contravention of my order or done intentionally."

Assuming the question was improper, we find little potential for prejudice. The judge sustained the defense objection and struck the answer from the record thereby precluding its use to sustain the State's case. He also prohibited the prosecutor from commenting upon the answer. We, therefore, find no harmful error in view of the judge's general jury instruction regarding objections which are sustained by the court.

 It is urged that the prosecutor improperly remarked during the questioning of a witness by a defense attorney that a trial is not a search for truth. We need not debate whether such a comment is a proper statement of the law. *See State v. Szemple,* 135 *N.J.* 406, 413–14, 640 *A.*2d 817 (1994); *State v. L.J.P.,* 270 *N.J.Super.* 429, 437, 637 *A.*2d 532 (App.Div.1994). Even if otherwise proper, it was an inappropriate remark for the prosecutor to have made at that time. However, it had no capacity to prejudice defendants. During his final instructions, the judge thoroughly explained to the jury its duty to decide whether the State had met its burden of proving defendants' guilt beyond a reasonable doubt. There was no danger that the prosecutor's fleeting remark had the potential to cause the jury to misconstrue its duty.

Defendants maintain that the prosecutor committed misconduct in his summation by: A) commenting on defendants' failure to testify; B) misusing the evidence and misstating the law; C) vouching for State witnesses and expressing a personal opinion of the evidence; D) denigrating the defense; E) commenting on defendants' failure to cross-examine witnesses; F) calling the jury to arms; and G) commenting upon defendants' failure to call Peter Quigley as a witness.

A prosecutor has considerable leeway in summations. *State v. Williams,* 113 *N.J.* 393, 447, 550 *A.*2d 1172 (1988). It has been noted that a prosecutor need not conduct him or herself in a

manner appropriate to a lecture hall. *State v. Johnson*, 31 *N.J.* 489, 510–11, 158 *A.*2d 11 (1960). A prosecutor is permitted to make a "vigorous and forceful presentation of the State's case." *State v. Bucanis*, 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied*, 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L.Ed.*2d 1160 (1958). When reviewing a prosecutor's conduct, an appellate court should be mindful that criminal trials create a charged atmosphere. *State v. Ramseur*, *supra*, 106 *N.J.* at 320, 524 *A.*2d 188.

■ We first consider the contention that the prosecutor improperly commented upon defendants' failure to testify at trial, including the singing of the song *Sounds of Silence*. The Fifth Amendment forbids a prosecutor from commenting upon a defendant's failure to testify as such comment would penalize defendant's constitutional right against self-incrimination. *Griffin v. California*, 380 *U.S.* 609, 614–15, 85 *S.Ct.* 1229, 1232–33, 14 *L.Ed.*2d 106, 109–10 (1965). Comment about a defendant's failure to present evidence is impermissible, if it could only be referring to the absence of testimony by the defendant. *State v. Sinclair*, 49 *N.J.* 525, 548–49, 231 *A.*2d 565 (1967); *State v. Irizarry*, 270 *N.J.Super.* 669, 675, 637 *A.*2d 965 (App.Div.1994).

Here, the prosecutor pointed out that defendants had no burden of proof, and then stated:

> And when I look at the defense's legal argument in their opening statements to you, I see dark, empty space in the argument. I picture a donut and I'll not pull a donut out of my file. But picture, if you will, a donut. What is the most noticeable characteristics [sic] of a donut? Well, of course, it is the hole in the middle.

He then explained the hole in the middle of defendants' opening arguments was the omission of any reference to what was done with or happened to the bat and broom.

Defendants objected throughout and then moved for a mistrial on the basis of the prosecutor's comments on silence. Defendants argued that the prosecutor's remarks were "meant to draw to the jurors' attention that certain things were said in the opening and that there was no testimony to it, and that the defendants could have and should have supplied that."

The judge disagreed, noting the prosecutor had carefully couched his comments as a criticism of defendants' opening arguments instead of defendants' testimonial shortcomings. He said the prosecutor's argument was that defendants stated in their openings that they were going to establish facts which they failed to establish at trial. He concluded the comments did not warrant a mistrial but that "out of an abundance of caution" he would remind the jury that defendants had no obligation to testify and that the jury should draw no negative inference from defendants' failure to testify. He, thereafter, gave the following instruction before the prosecutor proceeded further:

> I want to make sure you understand that this is part of our law, as you have seen in this case each defendant choose not to be a witness or to testify and it is the right of any defendant in any criminal case not to testify or to remain silent if he chooses to do so. I instruct you that you are not to consider for any purpose or in any manner in arriving at your verdict the fact that any defendant did not testify, nor should that fact enter into your deliberations or discussions in any manner or at any time. A defendant is entitled to have the jury consider all of the evidence and he's entitled to the presumption of innocence, even if he does not testify as a witness. The burden of proof is beyond a reasonable doubt still and always remains on the State. And of course no defendant ever has any burden of proof to do anything on any particular element of the offense.

The judge also gave a similar instruction at the end of trial.

Our Supreme Court stated in *State v. Sinclair*:

> The prosecutor has the right to make fair comment on the evidence and to argue to the jury the significance of the testimony presented, but when he begins to discuss the significance of what testimony was not presented and if it does not clearly appear that persons other than defendant could have been called, there is a danger that he may reflect upon a defendant's Fifth Amendment right to remain silent. Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated.
>
> [49 *N.J.* at 548–49, 231 *A.*2d 565 (citations omitted).]

In *Sinclair*, the Court disapproved of the prosecutor's comment that the testimony of an eyewitness was "uncontradicted," as only defendant and co-defendant could deny the testimony of the eyewitness and thus there was a "danger that the jury would draw an improper inference from Sinclair's failure to take the stand." *Id.* at 549, 231 *A.*2d 565.

However, in *State v. Purnell,* 126 *N.J.* 518, 539, 601 *A.*2d 175 (1992), our Supreme Court found no reversible error in the prosecutor's comment that defendant failed to explain how his sweatshirt was found at a prosecution witness's house, where the comment was in response to defense counsel's assertion in summation that the witness had lied when she testified that defendant was at her house. Our Supreme Court also found no misconduct where a prosecutor stated in his opening "[s]cience fails to be of assistance here, and only James Zola [defendant] and Barbara Berrisford [the murder victim] know for sure." *State v. Zola,* 112 *N.J.* 384, 427, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989). The Court found the challenged statement to be a "non-invidious reference to the circumstantial nature of the evidence." *Id.* at 427, 548 *A.*2d 1022.

Here, it is, of course, arguable that the reference to silence could be viewed by jurors as referring indirectly to the failure of defendants to produce such evidence, as it seems apparent that only the defendants would have the answer to the question posed, "what happened to the bat and broom." *See Sinclair, supra,* 49 *N.J.* at 549, 231 *A.*2d 565. Nonetheless, the judge did give a curative instruction to the jury shortly after the prosecutor's remarks on silence. Even a direct comment on a defendant's failure to testify may be cured by a judge's timely and effective action. *State v. McLaughlin,* 93 *N.J.Super.* 435, 439–40, 226 *A.*2d 47 (App.Div.1967). The adequacy of a curative instruction focuses on the capacity of the offending remark to lead to a verdict that could not otherwise be justly reached. *State v. Winter,* 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984); *State v. Witte,* 13 *N.J.* 598, 611, 100 *A.*2d 754 (1953), *cert. denied,* 347 *U.S.* 951, 74 *S.Ct.* 675, 98 *L.Ed.* 1097 (1954). Even in the context of a constitutional error, a curative instruction will not be deemed inadequate unless there is a real possibility that the error led the jury to a result it otherwise might not have reached. *State v. Winter, supra,* 96 *N.J.* at 647, 477 *A.*2d 323.

Here, we are satisfied that any possible infringement on defendants' right to silence did not rise to the level of reversible error because of the effective action of the trial judge in re-establishing in the minds of the jurors the importance of that right. *State v. McLaughlin, supra,* 93 *N.J.Super.* at 440, 226 *A.*2d 47. We note several other lesser instances of possible infringement by the prosecutor on defendants' right to silence, but we are satisfied that when viewed both separately and in the aggregate, reversal is not required. *Ibid.*

Defendants point to countless instances of what they assert are the prosecutor misstating the law and misusing evidence during an extremely lengthy summation covering six days. We have considered all of the arguments and contentions raised, but comment only on those we find to have sufficient merit to warrant discussion. *See R.* 2:11–3(e)(2).

■ A prosecutor is bound to confine his or her comments to facts revealed at trial and reasonable inferences which can be drawn from those facts. *State v. Acker,* 265 *N.J.Super.* 351, 357, 627 *A.*2d 170 (App.Div.), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993). Nor may a prosecutor mislead the jury about the evidence through half-truths or omissions. *State v. Millett,* 272 *N.J.Super.* 68, 90, 639 *A.*2d 352 (App.Div.1994).

■ The prosecutor's comments in summation on M.G.'s event drawing series were clearly improper. The judge admitted into evidence an "event drawing series," including representations of the basement incident, which M.G. had drawn at Burgess's request, but only because they were one of the bases for Burgess's opinion that M.G. exhibited RTS. Nonetheless, during summation, the prosecutor encouraged the jury to use the drawings for the purpose of deciding whether M.G. had been sexually assaulted. The prosecutor listed the State exhibits: "We have drawings, not photographs, including drawings of the attack itself, made by the victim in this case." Defendants objected, arguing that the drawings were hearsay and should not be used substantively. After

the judge improperly overruled the objection, the prosecutor stated:

> So later on when we talk about the drawings that [M.G.] made for Dr. Ann Burgess, you can appreciate all the more when you consider that with Ms. De Palma's testimony, that [M.G.], she may not be able to say it but she can do it and she can show it.

Defendants objected again because the prosecutor was using the drawings as direct proof that the sexual assault took place. This time the judge agreed and warned: "But I must insist, prosecutor, that to the extent you use and refer to these pictures, you not argue from them as truthfully depicting what occurred ..."

After a few days, the prosecutor returned to the subject of the event drawings, and despite the judge's warnings, the prosecutor said:

> Members of the jury some day these sheets of paper will yellow and fade. They are going to be filed away in a dusty legal file, but I submit to you that the images on what I would call the blue drawings of [M.G.], the image that appears on those papers will stay in [M.G.'s] mind and [M.G.'s] memory forever.

Defendants objected and immediately asked for a limiting instruction. The court told the jury:

> the exhibits that the Prosecutor has just shown you, the event drawing sequences that Dr. Burgess testified [M.G.] drew for her were admitted before you not for the truth of what she depicted. In other words, those were not admitted as showing pictures of what actually occurred in the basement. They were admitted for the limited purpose of explaining to you some of Dr. Burgess's opinions or some of the basis for Dr. Burgess's opinions.

██ Clearly, the prosecutor implied to the jury that the drawings were proof that M.G. had been sexually assaulted even after the judge had directly ruled the jury could not use the drawings for this purpose. A prosecutor may not allude to any matter not supported by admissible evidence. *State v. Pennington,* 119 *N.J.* 547, 575, 575 *A.*2d 816 (1990), *overruled on other grounds, State v. Brunson,* 132 *N.J.* 377, 392, 625 *A.*2d 1085 (1993). The drawings were admitted for a limited purpose and the prosecutor's use of them for the prohibited purpose was tantamount to alluding to inadmissible evidence and became blatantly improper once the judge ruled on the subject.

■ Despite the judge's curative instruction, the offending remarks had potential for misuse by the jury. The prosecutor urged the jury to misuse the evidence. Assuming the judge's instruction was inadequate to cure the prejudice, we find, nonetheless, that the prosecutor's comments on the event drawings are not sufficient grounds on which to reverse the convictions on Count Two. The State's evidence on defendants' knowledge of M.G.'s mental defect was overwhelming and the drawings would have had little, if any, relevance to that issue. Although they depicted Kevin and Christopher carrying out sexual acts, they were consistent with Paul's testimony in that regard and no harm was done in admitting the pictures. We, therefore, conclude that reversal of defendants' convictions related to sexual penetration of someone defendants knew to be mentally defective is not required. Similarly, the misconduct was not capable of tainting defendants' conspiracy convictions.

■ We come to the same conclusion regarding the prosecutor's use of and comment on a sign to the jury which said: "It was a terrible thing. It hurt." Although no one objected to Dawn Lipinski's testimony from which the sign originated, it was the prosecutor's interpretation of what the testimony meant, and it may not have been an accurate interpretation of the testimony. Further, the testimony was hearsay and most probably not admissible, except that it came out on recross examination and was not objected to. Because there was no objection, the testimony came into evidence, however, any use of it should have been carefully scrutinized because of its questionable meaning and its inflammatory nature. Even if the quote the prosecutor displayed was accurate, it does not mean his interpretation of what it meant is correct. However, again we find that any misconduct or error did not have the potential to taint the verdict except as to the charge set forth in Count Three.

■ We find nothing improper regarding the prosecutor's closing remarks as to the "worth" of the testimony of M.G.'s swimming instructor. The instructor's testimony was offered

under the hearsay exception for the mental state or condition of the declarant and the use of this testimony substantively is permissible. *See N.J.R.E.* 803(c)(3).

The prosecutor's remarks concerning the fact that "Corcoran's guilt is for another day and another jury" did not have the ability to mislead the jury as to the law of accomplice liability as defendants contend. The judge's instructions to the jury on the law of accomplice liability was thorough in this regard. Therefore, any perceived misstatement by the prosecutor was no doubt cured by the judge's instructions. *See State v. Hipplewith*, 33 *N.J.* 300, 315, 164 *A.*2d 481 (1960).

Defendants' assertions that the prosecutor improperly vouched for State witnesses and expressed a personal view of the evidence, are without substantial merit. *R.* 2:11–3(e)(2). A prosecutor may argue that a witness is credible but may not personally vouch for the credibility of a State witness or suggest that the witness's testimony has been "checked out," thereby referring to matters outside the record. *State v. Marshall, supra*, 123 *N.J.* at 156, 586 *A.*2d 85. Indeed, many of the remarks defendants complain about were in response to defense counsels' closing remarks. Defense counsel vigorously attacked the prosecution team. We find nothing in the conduct of the prosecutor in these respects sufficient to warrant reversal. *See also State v. Rivera*, 253 *N.J.Super.* 598, 605, 602 *A.*2d 775 (App.Div.), *certif. denied*, 130 *N.J.* 12, 611 *A.*2d 650 (1992); *Cf. State v. Goode*, 278 *N.J.Super.* 85, 90, 650 *A.*2d 393 (App.Div.1994).

Defendants further contend the prosecutor made numerous improper comments denigrating the defendants and defense counsel; calling attention to the failure to produce witnesses or to cross-examine State's witnesses; rallying or calling the jury to arms, and that the prosecutor commented on matters not in evidence, and that these comments deprived them of a fair trial.

A prosecutor may not cast unjustified aspersions on defense counsel or the defense. *State v. Acker, supra*, 265

*N.J.Super.* at 356, 627 *A.*2d 170. Neither may a prosecutor impugn the integrity of a lawyer as a means of imputing guilt to the defendant. *State v. Pindale,* 249 *N.J.Super.* 266, 286, 592 *A.*2d 300 (App.Div.1991). It is improper to suggest that testimony was fabricated with the assistance of defense counsel, *State v. Rose,* 112 *N.J.* 454, 518, 548 *A.*2d 1058 (1988); to characterize the defense as "outrageous" or "absolutely preposterous," *State v. Acker, supra,* 265 *N.J.Super.* at 356, 627 *A.*2d 170; or to suggest that defense counsel is obscuring the truth, *State v. Lockett,* 249 *N.J.Super.* 428, 434–35, 592 *A.*2d 617 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.*2d 366 (1991). Moreover, a prosecutor may not call a defendant by derogatory names. *State v. Pennington, supra,* 119 *N.J.* at 577, 575 *A.*2d 816. A prosecutor may not tell a jury that it has not "met the responsibility" thrust upon them, if it finds defendant not guilty. *State v. Knight,* 63 *N.J.* 187, 193, 305 *A.*2d 793 (1973). Nor may the prosecutor urge the jury to make a difference in society, the community, or neighborhood by convicting defendant. *State v. Goode, supra,* 278 *N.J.Super.* at 89, 650 *A.*2d 393.

We have carefully reviewed each instance of impropriety asserted by defendants. While in several instances the prosecutor walked on or even crossed the line, the trial judge took immediate and effective corrective action. Therefore, we are satisfied that they did not jeopardize defendant's right to a fair trial. *See State v. DiFrisco,* 137 *N.J.* 434, 475, 645 *A.*2d 734 (1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996).

## IX

Kevin claims he was denied his Sixth Amendment right to counsel due to his attorney's many absences from trial. His claim is an integral part of Kyle's assertion that Kyle was denied the undivided loyalty of his attorney, who agreed to "cover for" Kevin's attorney during those absences. Kyle further asserts that he was denied his right to counsel when his attorney was also

absent for a short time during trial, during which Kevin's attorney covered for his attorney.

Kevin's attorney was absent from many pretrial proceedings; a portion of jury voir dire; several days of testimony during trial, including the entire testimony of the State's expert witness, Dr. Burgess, M.G.'s swimming instructor and also a former investigator for the State; parts of his codefendants' and the prosecutor's summations; a portion of the charge conference; some of the jury's questions during deliberations; and also the reading of the jury's verdict. During many of these absences, Kyle's lawyer told the court that he was covering for Kevin's attorney. Most of these absences were unexplained on the record, but in some instances they appear to have been due to ill health of the attorney and because he left the State on family business.

Prejudice is presumed when counsel fails to appear at a critical stage of the proceedings or where counsel had an actual conflict of interest. *United States v. Cronic,* 466 *U.S.* 648, 659, 661 n. 28, 104 *S.Ct.* 2039, 2046, 2048 n. 28, 80 *L.Ed.*2d 657, 668, 669 n. 28 (1984); *State v. Savage,* 120 *N.J.* 594, 616, 577 *A.*2d 455 (1990); *State v. McCombs,* 81 *N.J.* 373, 376, 408 *A.*2d 425 (1979).

In *Green v. Arn,* 809 *F.*2d 1257, 1263 (6th Cir.), *vacated on other grounds,* 484 *U.S.* 806, 108 *S.Ct.* 52, 98 *L.Ed.*2d 17 (1987), *reinstated,* 839 *F.*2d 300 (6th Cir.1988), *cert. denied,* 488 *U.S.* 1034, 109 *S.Ct.* 847, 102 *L.Ed.*2d 979 (1989), the court held that the evidentiary portion of the trial was always critical, stating: "It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt." On the other hand, in *Vines v. United States,* 28 *F.*3d 1123, 1128 (11th Cir.1994), it was held that defense counsel's absence during the taking of evidence was not necessarily a Sixth Amendment violation. The Court stated: "Where, as in this case, no evidence directly inculpating a defendant is presented while that defendant's counsel is absent, we decline to hold that counsel was absent during a critical stage of trial within the meaning of *Cronic.*" *Ibid.* Similarly, in *United States v. Morrison,* 946 *F.*2d 484, 503 (7th Cir.1991), it was held

that a codefendant's cross-examination of a State witness was not a critical stage of trial as to the other defendant and that the absence of defendant's attorney was not presumptively prejudicial. The court reasoned that counsel was present during the direct testimony of the witness and, further, defendant and codefendant were not presenting antagonistic defenses. *Id.* at 503.

In *State v. DeLuzio,* 274 *N.J.Super.* 101, 118–19, 643 *A.*2d 609 (App.Div.1993), *aff'd in part,* 136 *N.J.* 363, 643 *A.*2d 535 (1994), a multi-defendant trial, defendant's attorney was absent during pre-trial motions, motions for judgement of acquittal, summations, the jury charge, and jury deliberations. *Id.* at 118, 643 *A.*2d 609. Citing *State v. McCombs, supra,* we noted it is firmly established that a defendant need not show prejudice by counsel's absence at critical stages because it is presumed to be prejudicial. *Id.* at 120–21, 643 *A.*2d 609. However, we refused to reverse defendant's conviction because the record supported the finding that defense counsel's non-appearance was a result of defendant's decision to purposely develop a strategy of 'nonchalance' to emphasize the defendant's insignificance in the conspiracy and illegal activities. *Id.* at 120–21, 643 *A.*2d 609. We, therefore, remanded for development of a record on whether counsel was absent with defendant's consent. *Ibid.*

■ Here, we have no doubt the certain testimonial evidence missed by Kevin's counsel was a critical stage of the trial. Burgess presented crucial testimony about the RTS and she described M.G.'s drawings directly inculpating Kevin as the one inserting the broomstick. Thus, since Kevin had no attorney present during critical stages of the proceeding, he was denied effective assistance of counsel, unless he waived the right to counsel.

■ While Kevin specifically consented on the record to his attorney being absent on many occasions, we find he did not waive his right to counsel. On December 22, 1992, the day before his attorney first missed trial testimony, the following transpired:

[Kevin's counsel]: Judge, as may be obvious to you, I am in some distress. Knowing the body the way I know it, I am not making it tomorrow without jeopardizing myself.

[Grober's counsel] assures me he will be a couple hours [cross-examining Dr. Meyerhoff], [Kyle's counsel] assures me he will be a couple hours, so in view of the fact that they can use up tomorrow, it's the last thing I want to see anybody do is waste time, another day would be terrible here, I have asked my client to waive my appearance tomorrow and he is standing by here ready to tell you it's okay with him.

The Court: Let's just place that briefly on the record.

[Kevin's counsel]: Kevin, come here, the judge wants to ask you some questions.

The Ocurt [sic]: Are you in agreement with your lawyer not being present here tomorrow?

Kevin Scherzer: Yes.

In a similar fashion, Kevin also consented on the record to his attorney being absent on January 6, 1993 (trial testimony), January 8, 1993 (trial testimony), January 12, 1993 (trial testimony), February 11, 1993 (codefendant's summation), February 16, 1993 (codefendant's summation), March 1, 1993 (prosecutor's summation), March 3, 1993 (prosecutor's summation and jury charge conference) and March 16, 1993 (reading of jury verdict). Also, Kyle's attorney stated that Kevin waived his attorney's presence on January 7, 1993 (trial testimony). All of the consents consisted of brief assents from Kevin. No explicit consent was obtained from Kevin when his counsel was absent from pretrial hearings, jury voir dire, and jury deliberations.

 A waiver is an intentional relinquishment of a known right or privilege. *Johnson v. Zerbst*, 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938). There is a strong presumption against waiver of so fundamental a right as that to counsel. *State v. Crisafi*, 128 *N.J.* 499, 508–09, 608 *A.*2d 317 (1992). Waiver may not be found from a silent record. *State v. Bellucci*, 81 *N.J.* 531, 544, 410 *A.*2d 666 (1980). The trial judge has the responsibility to determine whether a defendant had made an intelligent and competent waiver of counsel. *Johnson v. Zerbst, supra,* 304 *U.S.* at 465, 58 *S.Ct.* at 1023, 82 *L.Ed.* at 1467. Thus, where a defendant wishes to dispense with counsel and proceed *pro se*, the judge must conduct an extensive on-the-record

colloquy with defendant insuring a full understanding of the dangers and disadvantages of self-representation. *State v. Crisafi, supra,* 128 *N.J.* at 509–12, 608 *A.*2d 317.

Similarly, where defendant's counsel also represents another defendant, the judge must explore the matter "on the record both to ensure that defendant is aware of the potential hazards and to secure a proper waiver." *State v. Bellucci, supra,* 81 *N.J.* at 545, 410 *A.*2d 666; *State v. Land,* 73 *N.J.* 24, 33, 372 *A.*2d 297 (1977); *R.* 3:8–2. Nonetheless, a trial court's failure to engage in such a colloquy before the defendant decides on self-representation is not necessarily reversible error. *State v. Crisafi, supra,* 128 *N.J.* at 513, 608 *A.*2d 317. "In the exceptional case, if the record indicates that the defendant actually understood the risks of proceeding *pro se,* a waiver may suffice." *Ibid.*

Here, the judge failed to inform Kevin or question him to determine whether he understood the right he was giving up. The initial question, then, is whether it was necessary for the judge to engage in such an inquiry when defendant was giving up his personal counsel for individual days within a long trial.

In *State v. DeLuzio, supra,* 274 *N.J.Super.* at 120–21, 643 *A.*2d 609, we suggested that a *Crisafi* colloquy may not be critical when an attorney is only temporarily absent from trial. In *DeLuzio,* defendant, during trial, did not expressly waive his right to counsel or consent to his counsel's nonappearance at trial. *Id.* at 121, 643 *A.*2d 609. We expressed the view that the lack of an express waiver was inappropriate, but we also pointed out that defendant's counsel referred to defendant's consent on the record and, therefore, a remand for development of the record on this issue was warranted. *Ibid.*

In *United States v. Turner,* 975 *F.*2d 490, 495–96 (8th Cir.1992), *cert. denied,* 506 *U.S.* 1082, 113 *S.Ct.* 1053, 122 *L.Ed.*2d 360 (1993), defendant's attorney was absent during a portion of the eight-day trial. Defendant had signed a written waiver stating his attorney had explained the dangers of his attorney not being present for

the entire trial, but the judge confirmed on the record only that defendant agreed to his attorney not being present for some of the trial. *Id.* at 495–96. During the times that the attorney was not present, defendant had substitute counsel, usually one of his codefendants' lawyers. *Id.* at 496. The Eighth Circuit noted that normally the judge must determine on the record whether the waiver was knowing and intelligent, but held that even though it was not done the defendant's waiver was knowing and intelligent, as the trial judge was satisfied defendant's lawyer had properly advised defendant of the consequences of the waiver. *Ibid.* The court noted defendant was of age and competent and that his decision was voluntary. *Ibid.*

In contrast, in *United States v. Morrison, supra,* 946 *F.*2d at 502 n. 4, the Seventh Circuit rejected the government's argument that defendant waived his right to counsel. There, the trial judge merely asked defendant whether he consented to the continuation of the trial during his attorney's absence and defendant agreed. *Ibid.* The court held that this waiver was ineffective because the court failed to question defendant as to the potential consequences of proceeding without an attorney. *Ibid.*

Kevin was born on February 13, 1971, and was of full age at the time of trial, and there is no question as to his competency. However, there is no evidence that he had experience with the criminal justice system or that his counsel explained the implications and pitfalls of his absence so that he fully understood the right he was giving up. It is not apparent from the record, that anyone, even his attorney, explained to him the valuable right he was relinquishing or the dangers he could face by being unrepresented or represented by the attorney of a codefendant. Moreover, the attorney wished to be absent for personal reasons, and there is no reason to assume that he would inform Kevin of the dangers or do anything to discourage Kevin from consenting to his absences. Moreover, unlike *DeLuzio,* there is no suggestion that Kevin sought a strategic advantage from his attorney's absences. We reject the State's contention in this regard. Therefore, we

cannot conclude that Kevin intelligently and knowingly waived his right to counsel.

Nonetheless, the conclusion that Kevin did not waive his right to counsel does not end our inquiry, as many courts have employed a harmless error analysis in cases of temporary absence of counsel from trial. In *Siverson v. O'Leary*, 764 *F*.2d 1208, 1217–20 (7th Cir.1985), the Seventh Circuit held that counsel's absence from jury deliberations and return of the verdict constituted ineffective assistance of counsel but that these absences were harmless error. It acknowledged that in cases of attorney absence during a critical stage of trial "a defendant need not affirmatively prove prejudice under the second prong of the *Strickland* test in order to establish a Sixth Amendment violation." *Id.* at 1217. Nonetheless, the court held that the proper standard for determining prejudice in the circumstances presented was whether the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 *U.S.* 18, 87 *S.Ct.* 824, 17 *L.Ed.*2d 705 (1967). The court did expressly note, however, "that the lack of counsel at *some* critical stages may be considered prejudicial *per se,* and may result in automatic reversal of the defendant's convictions without any opportunity for a harmless error inquiry." *Id.* at 1217–18 n. 6. We cited the *Siverson* holding with approval in *DeLuzio, supra,* 274 *N.J.Super.* at 119, 643 *A.*2d 609.

Here, we must consider whether the attorney's absence during the taking of testimony is harmful error *per se,* or whether we may apply the *Chapman* harmless error analysis in such a situation. Federal courts considering this question have come to different results. In *Green v. Arn, supra,* 809 *F*.2d at 1260–61, defendant's attorney was absent while codefendant's attorney cross-examined the victim. The Sixth Circuit found that defendant had been denied effective assistance of counsel because of this absence, and declined to consider whether the error was harmless, stating:

We believe that the present case is one where a harmless error inquiry should be foreclosed. It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt. The absence of counsel during the taking of

evidence on the defendant's guilt is prejudicial per se and justifies an automatic grant of the writ [of habeas corpus] "without any opportunity for a harmless error inquiry."

[*Id.* at 1263 (citations omitted).]

*Accord, McKnight v. State,* 320 *S.C.* 356, 357–60, 465 *S.E.*2d 352, 353–54 (1995).

However, as discussed above, in *United States v. Morrison, supra,* 946 *F.*2d at 503, the Seventh Circuit found that the defense attorney's absence while codefendant's attorney cross-examined a government witness was not a Sixth Amendment violation because the cross-examination was not a critical stage of the trial. The court noted that the determination of whether a portion of the trial was critical depended on a prejudice analysis. *Id.* at 503 n. 5.

Similarly, in *Vines v. United States, supra,* although defense counsel was temporarily absent during the taking of testimonial evidence, the Eleventh Circuit held that a harmless error analysis was appropriate under the principles announced in *Arizona v. Fulminante,* 499 *U.S.* 279, 307–08, 111 *S.Ct.* 1246, 1264, 113 *L.Ed.*2d 302, 329–30 (1991). 28 *F.*3d at 1128–31. In finding harmless error, the Court reasoned that trial errors are subject to harmless error analysis but structural defects are not. *Ibid.* It viewed trial error as an " 'error which occur[s] during the presentation of [a] case to [a] jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless.' " *Ibid.* (quoting *Arizona v. Fulminante, supra,* 499 *U.S.* at 307–08, 111 *S.Ct.* at 1264, 113 *L.Ed.*2d at 329–30). It considered structural defects to affect "the framework within which the trial proceeds" and "involve deprivations of constitutional protections so basic that in their absence no criminal trial can be deemed reliable, nor any punishment fundamentally fair." *Vines v. United States, supra,* 28 *F.*3d at 1129 (citations omitted).

The Circuit Court, while recognizing that the United States Supreme Court held in *Fulminante* that total deprivation of counsel is a structural defect, nonetheless, held that the temporary

absence of defense counsel during a portion of the actual trial did not affect the conduct of the entire trial. The Court reasoned:

> While trial counsel may exercise poor judgment in absenting himself or herself from a portion of a trial, such flawed judgment does not necessarily infect the entire trial. For example, in a multi-defendant trial, testimony may be presented regarding one defendant that does not inculpate another defendant. Though we do not countenance the abandonment of a defendant by his counsel even during the presentation of non-inculpatory testimony, we cannot say that such an absence compromises the entire trial of that defendant such that harmless-error analysis would be inapplicable.
>
> *[Ibid.]*

We accept the Eleventh Circuit's analysis in *Vines*, that a temporary absence is not such a defect as to prevent a court from pursuing the issue of harmless error. We find this to be preferable to the *per se* harmful error approach of *Green*. As the United States Supreme Court stated in *Satterwhite v. Texas*, 486 *U.S.* 249, 256, 108 *S.Ct.* 1792, 1797, 100 *L.Ed.*2d 284, 293 (1988) (citation omitted): "The harmless error rule 'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' "

Because the error here is of constitutional dimensions, the harmless error standard which must be applied is the one enunciated in *Chapman v. California, supra*, 386 *U.S.* at 24, 87 *S.Ct.* at 828, 17 *L.Ed.*2d at 710, that is, whether the State has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."

We are convinced based on the entire record that the three defendants, Kevin, Kyle, and Archer, presented a joint defense in which the trial attorneys did not attempt to distinguish their clients or their conduct from the other defendants. The strategy of each defendant, as shown from their opening through their closing arguments, was to establish that M.G. consented to the sexual activities, to deny that M.G. was mentally defective, and to attack the prosecution and its case. Thus, the trial strategy of

each defendant was consistent and the actions of one defendant promoted the interest of all three.

Indeed, Kyle's attorney, in his opening stated:

You heard from [the other defense attorneys].

Now there is, ladies and gentlemen, a commonality of interest, even though, it would be foolish for me to say, and you are not foolish people, that we don't have a commonality of interest.

We view this case in a similar manner, so many of the things that [the other defendants' attorneys have] said, I would adopt.

This "all for one" trial strategy had a rational basis as defendants could be convicted not only as principles but also as accomplices. So, the acts of one of the defendants could, under appropriate circumstances, be charged to all defendants.

Our Supreme Court has said, in relation to codefendants' retaining a single attorney:

[E]ven if the possibility of divergence [of defendant's interest] is present, the defendants tactically may desire one counsel. Since a single attorney eliminates reciprocal attacks and a joint defense may have a certain jury appeal, defendants may desire joint representation irrespective of the possible conflict.

[*State v. Land, supra*, 73 *N.J.* at 32, 372 *A.*2d 297.]

In light of this obvious and expressed strategy, it is unlikely that the absence of one attorney would impact the outcome of the trial; where one of the attorneys was present, the interest of each defendant was protected.

While Kevin's attorney was absent during some pretrial proceedings, these absences were either *de minimis* or the proceedings were related solely to a codefendant, with the exception of the first Rape Shield Law hearing, the RTS hearing, and a portion of the jury voir dire. At the first Rape Shield hearing, Kyle's attorney said he was "sitting in for" Kevin's attorney. The other defense counsel present argued that evidence as to M.G.'s sexual history should be admitted. They contended that the sexual history was relevant to M.G.'s capacity to consent and whether she was coerced. The attorney representing the Scherzer brothers did not speak at argument, but the other three defense counsel argued the matter forcefully. Their interest was no different from that of the brothers, as they all wanted to have as much of M.G.'s

sexual history admitted as possible, and the judge later ruled that much of this evidence could be admitted. Clearly, the absence of one defense attorney at this hearing had no capacity to change the jury's verdict, both because Kevin and Kyle's position was vigorously argued by codefendants' counsel and because defendants received a substantial portion of what they sought.

At the RTS hearing, Kyle's attorney stated that he would also represent Kevin on that day because Kevin's attorney was sick. Dr. Burgess testified as to her credentials and was thoroughly cross-examined by Grober and Archer's attorneys. The four defense counsel present argued that Burgess should not be permitted to testify as a witness. Again, Kevin's interest in not having Burgess testify was identical to that of his codefendants. Anything Kevin's attorney could have added to the already substantial arguments of codefendants' counsel, would only have been cumulative.

The voir dire of prospective jurors stretched over eleven days. Kevin's attorney missed the afternoon session on September 22, 1992. He also missed the morning session on October 14, 1992, when the only defense attorney present was Kyle's attorney, who said he was covering for all defense counsel. However, no jurors questioned on that morning served on the jury, and Kevin's attorney was present in the afternoon for final jury selection. Ultimately, he exercised seven peremptory challenges, but he accepted on the final jury three of the jurors who were questioned on the afternoon of September 22.

"Jury selection is an integral part of the process to which every criminal defendant is entitled." *State v. Singletary*, 80 *N.J.* 55, 62, 402 *A.2d* 203 (1979). A defendant who is entirely unrepresented during jury selection has been deprived of his or her Sixth Amendment right to counsel. *State v. McCombs, supra*, 81 *N.J.* at 377, 408 *A.2d* 425.

Here, Kevin's attorney was not personally present for a small portion of the voir dire, however, he did miss the afternoon when

three of the jurors were questioned who actually sat on the jury. Nonetheless, we are completely satisfied that due to the joint defense strategy and counsel's participation in final jury selection, counsel's short absence during jury voir dire was harmless beyond a reasonable doubt. *United States v. Morrison, supra,* 946 *F*.2d at 503. If the other defense counsel had found any of the three jurors unfavorable to the defense, then they could have used one of their preemptories or advised Kevin's attorney to use one of his.

The longest absence from trial by Kevin's attorney began on the afternoon of January 6, 1993, immediately after Dr. Meyerhoff's testimony was complete. The absence continued on the seventh, eighth, eleventh and twelfth of January 1993. It was on the afternoon of the sixth that M.G.'s swimming instructor testified that M.G. came to her, related the incident and asked: "[H]ow do I say no if this happens again?" Kevin's attorney was not present for either her direct or cross-examination, but Kyle's attorney spoke to him by telephone and informed the court that Kevin's attorney waived his cross-examination of the instructor. Her testimony was damaging to all defendants, particularly the testimony that M.G. wanted to know how to say "no." However, all defendants had the same interest in undermining this testimony. In fact, only Archer's attorney cross-examined the witness, although the other defense attorneys were present. The extensive cross-examination of the witness by Archer's attorney was to the benefit of Kevin, as well as the other codefendants. The presence of Kevin's attorney would, beyond any doubt, have made no difference to the outcome of the trial.

Kevin's attorney also missed the testimony of a former prosecutor's investigator. The investigator testified that on August 3, 1989, he took a statement from M.G. in which he, on his own initiative, crossed out the word "forced" in the phrase "additional acts were forced upon me" and changed it to "done." This contradicts M.G.'s testimony that she had requested the change. Not only was this testimony insignificant in the context of the entire trial, but all of the defendants had the same interest in

disputing the investigator's testimony. The cross-examination by other defense counsel adequately protected the interests of Kevin.

Kevin's attorney was also absent for the testimony of Dr. Burgess, who testified that M.G. exhibited RTS. Part of her testimony related to drawings M.G. made of the sexual acts, including depictions of either Christopher or Kevin inserting the bat and Kevin inserting the broomstick. This testimony directly inculpated Kevin in the bat and the broom incidents. Nonetheless, because of our holding that the judge erred in permitting Burgess to offer her opinion that M.G. exhibited RTS and our vacating of the convictions on Count Three, we conclude that the absence during the improper testimony did no additional harm to Kevin.

Kevin's attorney also missed a portion of the summation of Archer's attorney. However, in light of the consistent strategies of Kevin and the codefendants this error is harmless beyond a reasonable doubt. His attorney then missed part of the prosecutor's third day of summation, the afternoon of the fourth day, and a few hours of the fifth day. Nonetheless, counsel for Kevin's codefendants frequently and vigorously objected to the prosecutor's remarks. Moreover, Kevin's counsel was present for the most critical portions of the prosecutor's remarks. We are confident that Kevin's interests were adequately protected during the State's summation.

Kevin's attorney missed a charge conference on the afternoon of March 3, 1993, as did Archer's attorney. Kyle's attorney again covered for Kevin's attorney. The judge prefaced the conference with these remarks:

> I'd like to continue and complete our on-going discussions with regard to the charge to the jury, the verdict sheet. I have provided you with drafts of certain portions of my jury charge and also 2 different versions of a verdict sheet, one with a summary of the elements of each offense on it and one without. *We've had a series of conferences with regard to the charge and you've indicated several things. When I say you, I mean attorneys for all defendants and the prosecution have indicated several requests or objections to the charge.*
>
> [Emphasis added.]

These remarks indicate that all counsel, including Kevin's and Archer's, had an opportunity prior to this conference to comment on the proposed charge and verdict sheet. The absence of the attorneys from this single conference was without capacity to prejudice Kevin.

Finally, Kevin's attorney was absent for most of the jury deliberations and for the return of the jury verdict. On these occasions the jury asked for read backs of testimony, for further instruction and brought to the court's attention the behavior of certain other jurors. Nonetheless, as the strategy of all the defendants was the same, Kevin was protected through the actions of the codefendants' counsel. Thus, under the circumstances of this case, the absence of Kevin's counsel during deliberation of the jury had no capacity to affect the outcome of the trial.

Regarding Kevin's attorney's absence when the jury delivered its verdict, we are mindful that such an absence may be harmful if it deprives the defendant "of the potentially valuable privilege of having the jurors polled individually on their verdicts." *Siverson v. O'Leary, supra,* 764 *F.*2d at 1219. However, here, the jury was polled upon the request of counsel for the codefendants. In *United States v. Osterbrock,* 891 *F.*2d 1216, 1218 (6th Cir.1989), the court found that the defense attorney's absence during the return of the verdict was harmless beyond a reasonable doubt where the trial judge polled the jury. We are satisfied the same is true here.

Clearly, the defendants conducted what was essentially a joint defense. Therefore, we are convinced beyond a reasonable doubt that none of the absences had the capacity to affect the verdict.

Kyle, however, claims he is entitled to a new trial because he was denied the independent assistance of counsel when his counsel agreed to cover for Kevin's counsel while the attorney was absent from trial. A defendant is constitutionally entitled to representation by a counsel whose loyalty is undivided. *State v. Bellucci, supra,* 81 *N.J.* at 538, 410 *A.*2d 666. "There is no greater impairment of a defendant's constitutional right to counsel

than that which can occur when his attorney is serving conflicting interests. The resulting representation may be more harmful than the complete absence of a lawyer." *Ibid.*

In *State v. Land, supra,* where one trial attorney represented throughout the trial both a husband and wife who were indicted for possession of drugs found in their home, our Supreme Court overturned the convictions stating both were denied effective assistance of counsel due to their attorney's conflict of interest. 73 *N.J.* at 28, 372 *A.*2d 297. The Court held:

> In all cases where an attorney represents more than one defendant, the trial court ought to advise the parties of their constitutional rights. This should be accomplished as soon as the trial court is alerted to the existence of multiple representation and feasibly may bring the matter to the attention of the defendants and counsel. The defendants may waive those rights, but the trial judge must make certain on the record that the defendants understandingly and knowingly have decided to forego separate counsel.
>
> [*Id.* at·33, 372 *A.*2d 297 (footnote omitted).]

The *Land* Court rejected a harmless error analysis in multiple representation cases and held: "In our opinion, the preferable rule is that, in the absence of waiver, if a potential conflict of interest exists, prejudice will be presumed resulting in a violation of the New Jersey constitutional provision guaranteeing the assistance of counsel." *Id.* at 35, 372 *A.*2d 297. Thereafter, *R.* 3:8–2 was adopted codifying that holding.

Here, Kyle's attorney represented both brothers during the absences of Kevin's attorney. Under *Land* and *R.* 3:8–2, the trial judge should have advised Kyle and Kevin of their constitutional rights to separate representation. There was a potential for conflict of interest between Kyle and Kevin, as a possible trial strategy for Kyle would have been to minimize his involvement in the sexual assaults and to argue he was not an accomplice of codefendants because he did not share their purpose. A defendant whose strategy is to diminish his or her own role in a crime may come into conflict with the interest of codefendants. *See State v. DeLuzio, supra,* 274 *N.J.Super.* at 120, 643 *A.*2d 609. In light of the potential conflict of interest and the absence of an express waiver by Kyle, he was deprived of his Sixth

Amendment right to a counsel whose loyalty was "untrammeled and unimpaired." *Glasser v. United States*, 315 *U.S.* 60, 70, 62 *S.Ct.* 457, 465, 86 *L.Ed.* 680, 699 (1942).

The question then is whether we may weigh the consequence of this transient violation of Kyle's right to independent counsel during trial. *Land* holds that harmless error analysis is generally inappropriate in cases of multiple representation. 73 *N.J.* at 35, 372 *A.*2d 297. However, we believe the facts here are sufficiently different from the facts of *Land* to permit a harmless error analysis to be applied. In *Land*, one attorney represented two defendants throughout the entire trial, and at no time did either defendant have separate counsel. Here, Kyle had the representation of his attorney from the time the charges were brought and continuously through trial. His attorney merely agreed to stand in for Kevin's attorney when he was unavailable. This arrangement of one defense attorney standing in for another at this lengthy trial, apparently sprung from the perception of all parties that they had joint interests and no conflict. This was evidenced by the trial strategy actually carried out during the entire trial.

Indeed, there may be sufficient evidence to raise an inference that the Scherzers were aware of their right to separate counsel, but surrendered that right in their pursuit of a joint strategy. The agreement that Kyle Scherzer's attorney would represent both brothers in the absence of Kevin Scherzer's attorney was placed on the record in the presence of both defendants. However, the record contains no evidence that the Scherzers were apprised of the potential pitfalls and hazards inherent in having a single attorney represent them. Therefore, while perhaps the record might support the inference that the Scherzers were nonetheless aware of these potential problems, we reject that inference because we find no prejudice in any event. So, while Kyle and Kevin may have in theory had a *potential* conflict of interest, in fact, the defense strategy chosen by them resulted in there being no conflict between their positions at trial, because

both defendants had the same interest and plan. Thus, the consistent trial strategy of all defense counsel results in the constitutional error being harmless beyond a reasonable doubt. *State v. Canery,* 144 *N.J.Super.* 527, 530–31, 366 *A.2d* 706 (App. Div.1976).

Kyle also argues that his own attorney's absence during trial deprived him of his right to counsel. His attorney's father died during the trial and the attorney was absent for approximately a day and one-half. Kevin's attorney agreed to stand in for him while he was gone. Kyle consented to this absence, however, he did not effectively waive counsel because the record is silent as to whether he understood his rights and the dangers of the substitute representation. Nonetheless, this error was again harmless because, as noted, the joint strategy of defense counsel ensured that Kyle's interests were fully protected in the absence of his attorney.

## X

It is argued that counsel were ineffective because of failure to comply with the time constraints of the Rape Shield Law, and their failure to comply with the judge's discovery orders, thereby losing the opportunity to refute the testimony of Dr. Burgess, and also failure to make a timely motion to have M.G. examined by a psychiatrist on the issue of her competency to testify.

In *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.2d* 674 (1984), the Supreme Court established a two-prong test that a defendant must meet in order to establish ineffective assistance of counsel. First, a defendant must show that counsel's performance was deficient. *Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.2d* at 693. Second, defendant must show that the deficient performance prejudiced the defense so as to "deprive the defendant of a fair trial, a trial whose result is reliable." *Ibid.* Thus, under *Strickland,* a defendant must establish prejudice. *Id.* at

692, 104 *S.Ct.* at 2067, 80 *L.Ed.*2d at 696; *State v. Savage, supra,* 120 *N.J.* at 614, 577 *A.*2d 455 (1990).

Regarding the judge's rulings on the Rape Shield Law, we have held that the decision to bar evidence did not have the capacity to change the result of the trial, as extensive evidence was admitted of M.G.'s sexual experience and aggressiveness. As to defendants' late request to have a defense psychiatrist conduct a further interview with M.G. so he could offer testimony to refute Burgess, no prejudice has come to defendants from their failure to request the interview sooner, as we have held that Burgess's testimony was improper and Count Three must be dismissed. If defendants had presented testimony to refute Burgess, they could not have achieved any better result.

 Lastly, half-way through trial, the defendants requested a competency hearing and an evaluation of M.G. The judge granted the competency hearing, but denied the belated request for evaluation. We find no likelihood that the granting of such an evaluation would have resulted in M.G.'s being disqualified. *N.J.R.E.* 601 (formerly *Evid. R.* 17) provides a general presumption of competency to testify:

> Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by these rules or by law.

Witness disqualification is the exception to the general rule of witness competency, *Germann v. Matriss,* 55 *N.J.* 193, 260 *A.*2d 825 (1970), and the decision as to competency is within the discretion of the judge. *State v. R.W.,* 104 *N.J.* 14, 19, 514 *A.*2d 1287 (1986); *see N.J.R.E.* 601.

Nothing in the record suggests that M.G. was not competent to testify and, therefore, the late application did not prejudice defendants' right to a fair trial. They were not deprived of their right to a fair trial by the trial court's denial of their request to allow a defense psychiatrist to examine M.G. on the issue of her compe-

tency to testify, as there is no reason to believe the examination would have been fruitful.

## XI

Defendants further argue the judge erred in failing to hold a hearing to determine whether M.G's testimony was unreliable due to suggestive interviews by the prosecutor and law enforcement officials. They assert that the trial testimony of Dr. Esquilin and other witnesses showed not only that M.G. had memory gaps, but that she was easily manipulated, compliant, and eager to please, and thus was susceptible to suggestion. M.G. had been interviewed numerous times by the prosecutors and by Investigator Byron, whom she considered a friend.

We decided *State v. Michaels, supra,* 264 *N.J.Super.* at 630–32, 625 *A.*2d 489, shortly after the completion of this trial and held that on remand the defendant would have the burden of demonstrating the impermissible suggestiveness of investigation procedures involving the child sex abuse victims. A year later our Supreme Court affirmed our decision. *State v. Michaels,* 136 *N.J.* 299, 642 *A.*2d 1372 (1994). The Supreme Court held that a pretrial "taint" hearing was the appropriate method of determining whether the investigatory interrogations and interviews "were so suggestive that they give rise to a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on defendant's guilt." *Id.* at 320, 642 *A.*2d 1372. The Court held that the initial burden of triggering the taint hearing is on the defendant, who must make a showing of "some evidence" that the victim's statements were the result of suggestive interview techniques. *Ibid.*

The factors that should be considered in assessing the reliability of a complaint regarding sexual offenses are: "(1) the age of the victim; (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked." *Id.* at 318, 642 *A.*2d 1372. Undue suggestiveness can occur when an interviewer has a preconceived notion of

what has happened to a child, the interviewer uses leading questions, the interviewer is a trusted authority figure, the person accused of wrongdoing is vilified during the interview, or the interviewer uses threats or rewards to pressure the child. *Id.* at 309–10, 642 *A.*2d 1372.

Here, M.G. was seventeen years old when the assault occurred, but her sister described her as talking as if she were five or six years old, and Meyerhoff said that she reads on a second-grade level, which would put her at the level of a seven-year-old child. Thus, she is on an intellectual level only a few years beyond that of the children in *Michaels,* although she has had a great deal more of life experience.

Detective Byron, the principal investigator, testified that she had approximately thirty official contacts with M.G. over the course of the investigation, and that she ran into M.G. numerous times around Glen Ridge. During some of the official contacts, Byron took M.G. out to lunch. Byron acknowledged that M.G. became attached to her and considered her a friend. M.G. and her mother also attended Byron's wedding ceremony at a local church, as uninvited guests. According to M.G., because of her friendship for Byron she did not at first accuse Corcoran, the son of Byron's supervisor, of assault as she did not want to get Byron in trouble with her boss. However, if believed, M.G. had enough independence to make a change in one of her statements to the prosecutor, when she had the word "forced" crossed out and replaced it with "done."

The jury heard the trial testimony from experts, friends, and family that M.G. is eager to please people, which leads to her doing whatever she thinks people want. At trial, she appeared to testify in accordance with whatever the counsel who was examining her seemed to want. She testified on direct that she went to the Scherzers' basement because defendants approached her and told her that she would get to go out with Paul if she did; whereas, under cross-examination she agreed with counsel that it was she who had approached Grober in the park and offered to

give him sexual favors. Then on redirect she said that this testimony on cross-examination was a lie. She also said she lied on the stand to defense counsel when she said she had not visited Byron's house, when she said that Grober did not push her head down when she performed fellatio, and when she said that she did not bleed when she urinated after the assault.

The expert witnesses viewed M.G.'s comments to Ferraez as symptomatic of her need to please people by telling them what she thinks they want to hear. Among those comments was M.G.'s statement that she had lied about Corcoran's involvement in the assault because the people in the prosecutor's office would not "get off [her] back." She also complained about the "stupid lawyers" who "tell [her] what to do." She told Ferraez that the prosecutors give her lollipops and lunch. Under cross-examination M.G. acknowledged she had been to the courtroom with the prosecutor four times before the trial to "practice" her testimony. However, on redirect she said that none of the people from the prosecutor's office pressured her to say or do anything against her will.

This is not a case, such as *Michaels,* where young children have given statements about extraordinary sexual acts that the defendants say never occurred. Nor, where one child's statement was used to pressure other children into molding their statements to conform to those of their peers. Here, M.G. described the same events in the Scherzer basement that Paul, a defense witness, described, with the main difference being in those aspects reflecting on the participants' state of mind. Although M.G.'s trial testimony shows that she was susceptible to leading questions, mere susceptibility is not enough to make a threshold showing that M.G.'s statements were the result of suggestive interview techniques. In any event, the inconsistencies and/or lies in her testimony were brought to the attention of the jury by defense counsel and the prosecutor. They obviously detracted considerably from her credibility, as reflected in the acquittals on six of the counts.

 We find no possibility that she misidentified defendants or made up the entire incident, as may have been the case in *Michaels*. Moreover, the competency hearing was conducted during which defense counsel were able to cross-examine M.G. about her ability to tell the truth. We strongly conclude that given presumption of competency and defendants' ability during the trial to bring M.G.'s inconsistencies to the jury's attention, that even if a hearing regarding the suggestiveness of the investigative procedures should have been held, the failure was clearly harmless. *R.* 2:10–2.

## XII

Kevin contends that various trial errors deprived him of his right to a fair trial. He argues that the trial judge should not have allowed the prosecutor's former investigator to testify while wearing his National Guard uniform. The prosecutor on direct examination elicited testimony that the investigator now worked full-time for the National Guard.

 Trial judges are given wide discretion in exercising control over the courtroom. *Horn v. Village Supermarkets, Inc.,* 260 *N.J.Super.* 165, 175, 615 *A.*2d 663 (App.Div.1992), *certif. denied,* 133 *N.J.* 435, 627 *A.*2d 1141 (1993). "If a party is a member of the armed services, a firefighter, or a priest, when appearing in court he or she should be entitled to dress in a manner ordinary to him or her." *Ryslik v. Krass,* 279 *N.J.Super.* 293, 298, 652 *A.*2d 767 (App.Div.1995).

 It would have been inappropriate for the judge to order the witness to go home and change before testifying, as defendants requested. *Ibid.* However, the judge should have instructed the jury that "no undue weight should be given to the testimony of the particular witness by reason of a profession." *Ibid.* Here, the judge did not instruct the jury not to give the witness's testimony additional weight based on his profession or uniform. However, the jury learned that he was merely wearing

his work clothes, and we conclude there was nothing about his position to cause the jury to give his testimony undue weight.

We find no reversible error in the judge's refusal to allow defendants to elicit from a Kearny police officer the reason that Paul Archer, called as a defense witness, had been brought to the police station after receiving *Miranda* warnings on March 3, 1989. Defendants asked to be allowed to bring that information out so that the jury would not be left to speculate that Paul had been accused of having committed a serious crime, such as murder or robbery.

Under *N.J.R.E.* 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." The trial judge has broad discretion to determine admissibility under this rule, *State v. Sands, supra,* 76 *N.J.* at 144, 386 *A.*2d 378, and only where there has been a clear abuse of that discretion should such a decision be overturned on appeal. *State v. Carter, supra,* 91 *N.J.* at 106, 449 *A.*2d 1280. Although it is usually the defendant who argues that evidence would be unduly prejudicial, a court may consider the prejudice to the State in evaluating whether to exclude evidence under *N.J.R.E.* 403. *State v. Wilbely,* 122 *N.J.Super.* 463, 467, 300 *A.*2d 860 (App.Div.), *rev'd on other grounds,* 63 *N.J.* 420, 307 *A.*2d 608 (1973). Although we might disagree with the trial judge's assessment of the risk of misleading the jury if defendants had been allowed to elicit testimony on the offense for which Paul was arrested, possession of alcohol by a minor, we conclude that the judge's decision was not a clear abuse of discretion sufficient to warrant reversal.

It is also contended the judge erred in overruling a defense objection to the State's questioning of two young male witnesses about why they left the Scherzer basement early. Defendants maintained the young people were fact witnesses and should only testify as to what they observed, not as to their

conclusions about what they thought might happen. Defendants urge that their personal morality, and feeling "something wasn't right there," were not relevant to whether crimes were committed in the basement and were highly prejudicial to defendants. The judge ruled that the boys' reasons for leaving the basement were "relevant to the issue of whether there was coercion, intimidation, any threats," which related to Count Three. He said that the risk of undue prejudice did not outweigh the probative value of the evidence.

We perceive the testimony to have been no more prejudicial than allowing the jury to learn that some of the other boys had the good sense to leave when they saw what was happening. All damaging evidence is prejudicial; it is only when the probative value is substantially outweighed by the potential prejudice that the evidence should be excluded. *State v. Frost,* 242 *N.J.Super.* 601, 620, 577 *A.*2d 1282 (App.Div.), *certif. denied,* 127 *N.J.* 321, 604 *A.*2d 596 (1990). Assuming that the better course would have been to prohibit testimony as to their personal reasons for leaving, we find no prejudice sufficient to warrant reversal.

Kevin contends that the judge violated his Sixth Amendment confrontation right when he denied defense counsel permission to question Paul as to the amount of prison time he would have been exposed to, twenty years, if he had not made an agreement with the State to give a statement in exchange for acceptance into PTI and to plead guilty to a disorderly persons offense. Defense counsel argued at trial that they had the right to examine the witness on anything that might affect his credibility, which included all aspects of the agreement Paul made with the State. On appeal, defendants cite a line of cases including *Giglio v. United States,* 405 *U.S.* 150, 92 *S.Ct.* 763, 31 *L.Ed.*2d 104 (1972); *State v. Carter,* 69 *N.J.* 420, 354 *A.*2d 627 (1976); and *State v. Gray,* 67 *N.J.* 144, 336 *A.*2d 486 (1975) to support their right to cross-examine the witness as to anything that would affect his credibility.

The trial judge perceived that defendants wanted to get the lengthy prison exposure to which defendants were also exposed before the jurors so that they would feel sympathetic toward defendants, in order to affect their verdict and to show that Paul refused to inculpate defendants when interviewed by the prosecutor despite knowledge that he could be exposed to serious consequences if he refused. The judge believed defendants could sufficiently explore that area by eliciting the testimony that Paul understood he could be exposed to a "lengthy prison term."

In *Gray, supra,* 67 *N.J.* at 147, 336 *A.*2d 486, the Court ruled that it was error for the trial court to preclude defense counsel from bringing out on cross-examination of a State's witness how much prison time he had been saved by being indicted for robbery rather than armed robbery, the offense with which the defendants had been charged. However, the Court held that the error was not prejudicial because the witness had already admitted he was testifying to get a lighter sentence. *Ibid.* We find the situation to be little different here. Moreover, defendants were not trying to attack Paul's credibility but rather to bolster it by showing that despite the threat of serious charges he would not inculpate defendants. *See Engel, supra,* 249 *N.J.Super.* at 375, 592 *A.*2d 572.

We find that none of the remaining assertions of trial error have sufficient merit to warrant written discussion in this opinion. *R.* 2:11–3(e)(2). Clearly, they do not rise individually or in the aggregate to the level of reversible error.

### XIII

It is urged that the judge's comment during his jury instruction regarding the defense psychiatrists' access to M.G. raised the inference that the experts did not testify because their opinions were adverse to defendants. They claim this compelled them to negate this adverse inference and thereby violated their right to remain silent and impermissibly shifted the burden of proof to defendants.

On February 4, 1993, at a charge conference, the prosecutor requested a jury instruction that defendants' experts were given access to M.G., in order to alleviate the misperception that defendants were denied the opportunity to evaluate M.G.'s mental status. The judge noted that "technically" defendants had access to M.G. because the State did nothing to preclude them from talking to her, but "in reality" they did not have access because M.G.'s mother would not permit her to speak to defendants' attorneys. The judge concluded the prosecutor's request would make the jury wonder why the defense experts did not testify, which would be "injecting issues into the case that are not really there." However, he ruled that defense counsel would not be permitted "to comment in summation or to infer a lack of access to [M.G.]" because there was "limited indirect access" to her through defense experts.

On February 17, 1993, after all but one defense counsel had completed their summations, the State renewed its request for an instruction on the issue of defendants' access to M.G. due to what it claimed were ten "glaring instances" of comments during summation by all except Kyle's attorney on their lack of access. Defendants objected, asserting that their references to being denied direct personal access to M.G. were true and that they avoided references to defense experts' access.

The judge considered defense counsels' "calculated" comments unfair to the State because his earlier ruling had prohibited the State from using the information on defendants' access to its advantage. Due to the flouting of his ruling, the judge found it necessary to correct the "incomplete and misleading impression" with which defense counsel had left the jury. Therefore, in his final instructions, he told the jury:

As you may recall, some of the defense attorneys commented in their summation that while the prosecutors had spent many hours with [M.G.] before she testified at trial, none of the defense attorneys spent any time with [M.G.] before trial. That is true. However, it is also true that no defense attorney ever actually attempted to interview or speak to [M.G.]. Moreover, there was no evidence that the State, the prosecutors ever interfered with the ability of defense counsel to seek to speak with [M.G.]. And you should know that before the trial began the Court did order [M.G.]

to submit to interviews by agents of the defendants' attorneys and [M.G.] was interviewed on five occasions by agents of defense attorneys.

An appropriate charge is essential for a fair trial. *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982). The court must be certain that its instructions are presented in fair and impartial terms. *State v. Green*, 86 *N.J.* 281, 290, 430 *A.*2d 914 (1981). It must also ensure that the jury is not "misled by consideration of issues not proper for its deliberation." *State v. Grunow*, 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986).

The judge's instruction used the terms "agents" instead of "psychiatrists" and "interviews" instead of "examinations," in order to be as fair as possible. *Green, supra*, 86 *N.J.* at 290, 430 *A.*2d 914. He recognized that the instruction had the capacity to inject into the trial issues that were not the proper subject of the jury's deliberations, but concluded that, on balance, the instruction was necessary. *Grunow, supra*, 102 *N.J.* at 148, 506 *A.*2d 708. Any potential prejudice to defendants was minimized by the judge's proper instruction on the State's burden of proof. *United States v. Wright*, 845 *F.Supp.* 1041, 1067 (D.N.J.), *aff'd*, 46 *F.*3d 1120 (3d Cir.1994). Further, he did not instruct the jury on any inferences raised by the failure of defendants to call their agents as witnesses, nor did he allow the prosecutor to comment on defendants' failure to produce psychiatric experts.

We find no abuse of the judge's broad discretion. *Green, supra*, 86 *N.J.* at 290, 430 *A.*2d 914. Defendants implied the State had prevented them from interviewing M.G., when in fact, it was M.G.'s mother who refused to allow her to talk to them. The judge in seeking to minimize any jury misperceptions created by defendants, did so in neutral language without implying a shift in the burden of proof or violating defendants' privilege against self-incrimination. *Wright, supra*, 845 *F.Supp.* at 1067 n. 28.

All defendants seek reversal based on allegations of errors in the final jury instruction on accomplice liability; on mental defectiveness; the need for unanimity as to the act of penetration; failure to charge the asserted lesser-included offenses of endan-

gering the welfare of an incompetent person under Counts Two and Three; and failure initially to charge any lesser-included offenses for Count Three.

They assert the accomplice liability charge failed to cover adequately three aspects of accomplice liability: (1) that to convict one of them as an accomplice to first degree aggravated sexual assault the jury must find that the accomplice possessed the same state of mind as the person who actually committed the assault; (2) that an accomplice who has a lesser mental state than the principal may be convicted of a lesser degree of the crime than the principal; and (3) that a defendant might be found guilty as an accomplice as to one count and not another, depending on whether the jury found that he shared the requisite mental state for that count. Defendants also argue that the judge failed to relate the charge to the facts of the case.

Under *N.J.S.A.* 2C:2–6c(1)(b), an accomplice is a person who, with the purpose of promoting or facilitating another person in the commission of an offense, aids or agrees or attempts to aid the other person in planning or committing the offense. Thus, a jury must be instructed that to convict a defendant as an accomplice, it must find that he or she "shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." *State v. Fair,* 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965). Parties who participate in a criminal act may have a different level of intent, and thus may be guilty of a higher or lower degree of the crime, depending on their own actions and state of mind. *Ibid.* Therefore, when a defendant is charged as an accomplice to an offense for which different degrees are available to the jury, the judge must "carefully impart[ ] to the jury the distinctions between the specific intent required for the grades of the offense." *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987); *State v. Bielkiewicz,* 267 *N.J.Super.* 520, 531, 632 *A.*2d 277 (App.Div.1993).

In our decision in *Bielkiewicz, supra,* 267 *N.J.Super.* at 531–32 n. 2, 632 *A.*2d 277, we noted that the Model Jury Charge (in use at

the time of the present criminal trial) failed to adequately explain that a jury may find an accomplice guilty of a different degree of an offense than the principal if the accomplice had a different intent. The present Model Criminal Jury Charge on accomplice liability, as revised May 22, 1995, included two changes relevant to the *Bielkiewicz* decision. First, it dropped the following sentence: "However, one cannot be held to be an accomplice unless you find that (he/she) possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act." The trial judge here did not include this sentence in his charge. Second, the revision added the following reminder: "(Again, remind the jury to consider the accomplice status separately as to each charge)."

We start by pointing out that the jury charge involved several lesser included offenses relating to the second and third counts, which the judge fully explained when going over the verdict sheet with the jury. He explained that the lesser included offenses involving a defendant acting alone could not apply to penetration with the stick or with M.G.'s fingers because the only evidence adduced regarding the stick was that Corcoran, who was not a defendant at trial, inserted it, and the evidence showed that M.G. inserted her own fingers into her vagina. He also pointed out that only Archer's and Kevin's names were listed under these counts because "there was no testimony regarding Bryant Grober or Kyle Scherzer with regard to being the ones who alone allegedly used the bat or broom." The judge did not mention accomplice liability when instructing the jury on lesser included offenses.

The charge on accomplice liability included the following:

Now, when are two people acting together as accomplices or aiders and abettors? And I'm going to use those terms interchangeably, they mean the same thing. *A person is an accomplice of another person in the commission of a crime when they have the same purpose in their mind, they mean or intend to do the same thing* and that purpose is to promote or make it easier or facilitate the commission of a crime and with that purpose the accomplice or the aider and abettor solicits or asks the other person to commit the crime or that person, the accomplice, helps or aids or assists or tries or attempts to aid or assist the first person in planning or

committing the crime. The State has to prove three things for you to be able to find accomplice liability on the part of any defendant.

First, the State has to satisfy you beyond a reasonable doubt that at least one defendant committed a crime, let's say a crime of aggravated sexual assault or aggravated criminal sexual conduct and I'll be explaining those things in a few moments.

Secondly, the State has to prove beyond a reasonable doubt that the first defendant whose guilt you are considering, the alleged accomplice acted purposely to promote or make it easier for the other friend or accomplice to accomplish or commit that crime. You act purposely with regard to something when you intentionally do it, when you mean to do it. You have a conscious object in your mind to do it.

And third, and finally, the State has to prove for accomplice liability that the defendant accomplices [sic] guilt you are considering either asked one of the other defendants to commit the crime, solicited, strongly urged, suggested, lured him into committing a crime or aided, assisted, helped, supported the efforts of the other defendants to commit the crime or agreed to aid or attempted to aid at least one defendant in committing the crime.

[Emphasis added.]

Significantly, defendants did not object during the charge conference or at trial.

 The portion of the charge we have underlined explained that to convict one of the defendants as an accomplice, the jury must find that he had the same purpose as the principal, that is, he must have intended to commit the same offense as the principal. While the judge did not specifically instruct the jury that it could convict one defendant as a principal of first degree aggravated sexual assault and another defendant as an accomplice of a lower-grade offense, his failure to do so, in these circumstances, was not plain error. *R.* 2:10–2. Later in the charge, the judge told the jury it *must* determine each defendant's guilt or innocence on each charge separately. In addition, the judge carefully explained each of the lesser-included offenses of each count and how they related to each defendant, and the verdict sheet had the appropriate defendants names next to each of the charges and lesser-included offenses.

The lesser-included offenses here involved different circumstances surrounding the alleged assaults rather than different states of mind. Thus, the level of defendants' intent was less

crucial to the verdicts. The offenses were to be downgraded, here, if the jury found that a defendant acted alone rather than as part of a group, only went as far as an attempt to commit the offense, or touched the outside rather than the inside of M.G.'s vagina with the bat. Accomplice liability could not apply to the lesser-included offense for acting alone. The jury had only the factual issue of whether the bat penetrated M.G. or just touched the outside of her vagina, or whether a defendant was involved as a principal or an accomplice with the broom or stick.

While jury consideration of Counts Two and Three were complicated, their verdict, acquitting Kyle as to the first degree charge in Count Two and convicting him instead of attempted sexual penetration with the bat over which he had placed the plastic bag, attests to the jury's understanding of the option of convicting a defendant of a lesser degree of an offense than the principal.

Defendants contend that the jury instruction on the meaning of "mental defectiveness" constituted plain error because it failed to inform the jury that the conduct criminalized under *N.J.S.A.* 2C:14–2a(5)(b) is "intercourse with a woman known to the defendant to be manifestly and seriously deranged," language, defendants say was necessary in order to supplement ambiguous statutory language. They urge that the jury, because of the omission was able to convict defendants for engaging in sexual conduct with a person who was only mildly mentally retarded, which was outside the scope of conduct intended to be criminalized by the Legislature.

*N.J.S.A.* 2C:14–2a(5)(b) provides that a defendant is guilty of aggravated sexual assault if he or she commits an act of sexual penetration when aided or abetted by one or more other persons and "the victim is one whom the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated." The Code defines "mentally defective" as:

> that condition in which a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent;

[*N.J.S.A.* 2C:14–1(h).]

Under *State v. Olivio, supra,* 123 *N.J.* at 564, 589 *A.*2d 597, a person is mentally defective under *N.J.S.A.* 2C:14–2 "if, at the time of the sexual activity, the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another." The Supreme Court cited the following passage from a report issued by the New Jersey Criminal Law Revision Commission:

> The difficult problem is to define the degree of mental deficiency or impairment which shall bring the statute into play. The Code limits criminality to situations of known mental disease or defect so serious as to render the woman "incapable of appraising the nature of her own conduct." Conditions affecting only the woman's capacity to "control" herself sexually will not involve criminal liability. Also, by specifying that the woman must lack capacity to appraise "the nature" of her conduct, we make it clear that we are not talking about appraisals involving value judgments or consideration of remote consequences of the immediate acts. *The typical case that remains within the revised clause would be the case of intercourse with a woman known to the defendant to be manifestly and seriously deranged.*
>
> [*Id.* at 556–57, 589 *A.*2d 597 (quoting *Commentary to the New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission* 194–95 (1971)).]

In *Olivio,* the Court concluded that the evidence supported the jury's finding that the sixteen-year-old mildly retarded victim was mentally defective because she had only a rudimentary understanding of sexual conduct and had the social maturity of an eight-year-old child, from which a reasonable jury could conclude that she did not understand that her body was private, that she had a right to be free from the invasion of others, and that she had the capacity to refuse to engage in sex. *Id.* at 567, 589 *A.*2d 597.

In this case, the jury asked for reinstruction on the definition of mentally defective. The judge repeated his charge and gave the jury a written copy of the charge that he had earlier submitted to counsel for their approval. Counsel did not object to the original charge, the recharge, or the written instructions.

■■■ Nothing in *Olivio* requires inclusion of the "seriously deranged" language from the Law Review Commission's report in

a jury charge on "mentally defective." On the contrary, the holding in *Olivio,* while providing the guidance necessary to avoid including within the statute's scope conduct not intended to be criminalized, i.e., consensual sexual activity with a mildly retarded person, nonetheless permits a jury to find culpability where a mildly retarded person has a readily recognizable mental defect depriving that person of the capacity to refuse to engage in sex. *Id.* at 567, 589 *A.*2d 597. The charge here distinguished between mentally retarded and mentally deficient and correctly tied in the legal concept of mental defectiveness to the facts of the case. We find no error in this portion of the charge, let alone plain error.

It is urged on appeal for the first time that the judge's failure to instruct the jury that it had to agree unanimously on which act of penetration occurred as to each defendant deprived them of their constitutional right to a unanimous verdict. They point out that Counts Two and Three alleged four different acts of sexual penetration, with a bat, a broom, a stick, and M.G.'s fingers, involving five different people, the four defendants and M.G.

Both the New Jersey Constitution and court rules require a unanimous jury verdict in criminal cases. *N.J. Const.* art. I, ¶ 9; *R.* 1:8-9. In *State v. Parker,* 124 *N.J.* 628, 633-39, 592 *A.*2d 228 (1991), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992), our Supreme Court recognized that in certain circumstances a general charge on jury unanimity will not suffice; such as where the facts are exceptionally complex, the allegations in a single count are either contradictory or only marginally related to one another, there is a variance between the indictment and the proof at trial, and there is a tangible indication of jury confusion, such as the jury's request for reinstruction on the issue. *Parker, supra,* 124 *N.J.* at 636, 592 *A.*2d 228.

In *Parker,* the indictment for official misconduct charged the defendant, a teacher, with sexually abusing, humiliating, and otherwise endangering the welfare of school children. *Id.* at 639, 592 *A.*2d 228. The Court said that the acts charged in the indictment were not conceptually distinct because they all referred to conduct

that can endanger a child, either physically or mentally. *Ibid.* Furthermore, the jury had not exhibited any confusion by asking for a recharge. *Ibid.* Finally, as here, the defendant did not request a specific unanimity charge, thus the Court reviewed the issue as a matter of plain error and determined that the instructions as a whole did not pose a genuine risk that the jury would be confused. *Id.* at 638, 640, 592 *A.*2d 228.

Count Two of the indictment charged defendants with violating *N.J.S.A.* 2C:14–2a(5)(b) (mentally defective) and Count Three charged them with violating *N.J.S.A.* 2C:14–2a(5)(a) (force or coercion). The criminal act for both offenses is "an act of sexual penetration," which is defined in *N.J.S.A.* 2C:14–1(c) as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction."

After explaining the legal meaning of the term "sexual penetration," the judge charged the jury as follows:

if you find from any of the evidence that any defendant or his accomplice caused [M.G.] to perform fellatio on someone or if you find any defendant or his accomplice inserted a bat or a broom or a stick into [M.G.]'s vagina or if you find that any defendant or his accomplice caused [M.G.] to insert her own fingers into her vagina, that constitutes sexual penetration.

The judge gave only a general unanimity instruction to the jury; however, because defendants did not request a specific unanimity instruction, the issue must be analyzed as a matter of plain error. *R.* 2:10–2.

The offenses here require only one type of act, sexual penetration. The acts of penetration alleged are conceptually similar enough not to have required a specific unanimity charge. The jury did not evidence confusion by requesting reinstruction on the meaning of sexual penetration, and defendants did not request an instruction on the need for unanimity as to which acts of penetration occurred. The allegations in Counts Two and Three were neither contradictory nor only marginally related to one another. There was no variance between the facts alleged in the indictment and the proofs adduced at trial. We reject defendant's contention

that the jury verdict reflects confusion. The jury instructions, when considered as a whole, did not create a genuine risk of jury confusion, and thus were not clearly capable of producing an unjust result. *R.* 2:10–2; *Cf. State v. Harris,* 141 *N.J.* 525, 662 *A.*2d 333 (1995); *Parker, supra,* 124 *N.J.* at 638–40, 592 *A.*2d 228; *State v. Bzura,* 261 *N.J.Super.* 602, 608, 619 *A.*2d 647 (App.Div.), *certif. denied,* 133 *N.J.* 443, 627 *A.*2d 1147 (1993).

▮▮▮▮ Defendants contend it was plain error not to charge, as a lesser included offense of Counts Two and Three, *N.J.S.A.* 2C:24–7, endangering the welfare of an incompetent person, i.e., the disorderly persons offenses to which Quigley and Paul pled guilty. We do not agree.

*N.J.S.A.* 2C:1–8d and e govern when a lesser included offense may be submitted to a jury. Those sections provide:

d. Conviction of included offenses permitted. A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

e. Submission of included offense to jury. The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.

[*N.J.S.A.* 2C:1–8d and e.]

▮▮▮▮▮▮ A purpose of the doctrine is "to assure fairness in the fact-finding process at trial through the avoidance of the coercive prejudice of an all-or-nothing verdict." *State v. Muniz,* 118 *N.J.* 319, 327, 571 *A.*2d 948 (1990). The "rational basis" test of *N.J.S.A.* 2C:1–8e "imposes a low threshold ... for permitting a charge on a lesser-included offense." *State v. Crisantos,* 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986). There need be a rational basis in the evidence for the jury to convict the defendant of the lesser offense, and there must also be a rational basis in the evidence for

a jury to acquit the defendant of the charged offense. *State v. Brent*, 137 *N.J.* 107, 113–14, 644 *A.2d* 583 (1994).

When a defendant requests a lesser included offense charge, the judge is obligated to examine the record thoroughly to determine if the rational basis test of *N.J.S.A.* 2C:1–8e has been satisfied. *State v. Maiorana*, 240 *N.J.Super.* 352, 364, 573 *A.2d* 475 (App.Div.1990), *certif. denied*, 127 *N.J.* 327, 604 *A.2d* 601 (1991). However, when the defendant does not request such a charge, as is the case here, the trial judge does not "have the obligation on its own meticulously to sift through the entire record" to see if the facts and inferences might sustain a particular charge. *State v. Choice*, 98 *N.J.* 295, 299, 486 *A.2d* 833 (1985).

*N.J.S.A.* 2C:24–7 provides:

Endangering the Welfare of an Incompetent Person. A person is guilty of a disorderly persons offense when he knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a person who is unable to care for himself because of mental disease or defect.

The statute, part of the chapter on "Offenses Against the Family, Children and Incompetents," protects those unable to care for themselves because of a "mental disease or defect." This is a different type of mental defect than that referred to in the offense charged, *N.J.S.A.* 2C:14–2a(5)(b), where the victim's status as "mentally defective" refers to the victim's inability to understand the distinctively sexual nature of sex or to say "no" to sex. *Olivio, supra*, 123 *N.J.* at 564, 589 *A.2d* 597.

The facts adduced at trial do not support a rational basis for charging *N.J.S.A.* 2C:24–7 as a lesser included offense. The plea judge accepted Quigley's and Paul's guilty pleas because he said that they stayed in the basement and did nothing to stop others from sexually assaulting M.G. But according to Paul's testimony on behalf of defendants, Kevin and Archer helped M.G. move the broom in and out of her vagina and Kyle helped prepare the bat for insertion into M.G. by putting a protective plastic bag over it. Their active role in the sexual activity separates their conduct from that of Quigley and Paul, and from conviction of the disorder-

ly persons offense sought. Thus, we find no plain error in the judge's failure to *sua sponte* charge endangering.

According to defendants, the trial judge committed plain error when he failed in his initial charge to instruct the jury on the lesser included offenses of Count Three and inappropriately shifted onto defendants the burden of proving that the bat did not penetrate M.G.; they say he also failed to relate the law to the facts of the case. Kyle points to the inconsistent verdicts on Counts Two and Three. On Count Two he was acquitted of aggravated sexual assault and convicted only of the lesser included offense of attempted assault with the bat, and on Count Three he was convicted of aggravated sexual assault.

The Supreme Court in *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973), stated that "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." The Supreme Court followed the same approach in *State v. Maldonado*, 137 *N.J.* 536, 579, 645 *A.*2d 1165 (1994). In *State v. Latimore*, 197 *N.J.Super.* 197, 213, 484 *A.*2d 702 (App.Div.1984), *certif. denied*, 101 *N.J.* 328, 501 *A.*2d 978 (1985), we held that the two general instructions on the State's burden of proof overcame the alleged error when the judge instructed the jury that in the absence of proof that a weapon was for a lawful purpose, it could conclude that it was for an unlawful one. The instruction, not objected to at trial, was not considered plain error. *Latimore, supra*, 197 *N.J.Super.* at 213, 484 *A.*2d 702.

In the present case, the same four lesser included offenses were submitted to the jury on both Counts Two and Three, i.e., second degree sexual assault, vaginal penetration with the bat or broom by defendant alone; second degree attempted aggravated sexual assault, attempted penetration with the bat by defendant while he was aided and abetted by others; third degree aggravated criminal sexual contact, causing the bat to touch the outside of M.G.'s vagina while aided or abetted by others; and fourth degree criminal sexual contact, causing the bat to touch M.G.'s vagina

while acting alone. The only difference between the two counts is whether force or coercion was used or whether defendants knew that M.G. was mentally defective.

In his jury charge, the judge explained Count Two, first degree aggravated sexual assault, and then described the lesser included offenses included within that count. He then proceeded to explain the third count and the concept of force or coercion, at the end of which he said he would be explaining the lesser included offenses of Count Three after the jury took a short break. When the jurors returned, instead of immediately instructing them on the lesser included offenses, the judge explained aggravated criminal sexual contact, conspiracy, and other matters. It was not until he began explaining the verdict sheet to the jury that he returned to the subject of lesser included offenses. During his charge on one lesser included offense, he said:

> Turning to [count] two (b) this is another type of lesser included offense, attempted aggravated sexual assault and this only relates to the bat because there was testimony alone regarding the bat that if you were to believe it you may believe that the bat didn't actually penetrate [M.G.], but there was an attempt to penetrate. *And if that's the version that you accept as true beyond a reasonable doubt, consider two (b) as to each of the four defendants.*
>
> Two (c) is yet a lesser included offense, aggravated criminal sexual contact relating only to the bat, if you were to find only that the bat didn't penetrate and just touched the outside of [M.G.]'s vagina with all the other elements there but you don't find that there was any attempt or intention to penetrate.
>
> Finally, on the next page, two (d) the yet lesser included offense of fourth-degree, criminal sexual contact, the defendant alone causing the bat to touch the outside of [M.G.]'s vagina with the other elements there only applying to the two possible defendants it could apply to [Archer and Kevin].
>
> Count three, which follows, and you will see in the lesser included offenses under three (a), three (b), three (c) and three (d), parallel to, the only difference being three (a), (b), (c) and (d) all relate to force or coercion rather than knowing or should have known [M.G.] was mentally defective.

[Emphasis added.]

Defendants correctly contend that the underlined portion of the charge impermissibly shifted the burden of proof onto defendants. However, the judge had given the following burden of proof instruction at the beginning of his charge:

> Each defendant in this case as any defendant in a criminal case is presumed to be innocent of all charges unless and until he has been proven guilty by the State beyond a reasonable doubt. The legal phrase we use for that concept is presumption of innocence. Presumption of innocence continues throughout the entire trial of the case and even during your deliberations and discussions unless and until you have decided or determined that the State, the prosecution, has proven the guilt of that defendant on a charge and proven it beyond a reasonable doubt.
>
> The legal phrase for the job that law puts on the shoulders of the prosecutor is called the burden of proof. The burden of proof rests on the State. It never shifts. It remains on the State throughout the trial of the entire case. There is no burden of proof imposed on any defendant. No defendant is obliged to prove to you his innocence as to any charge. On the contrary. Unless the State, the prosecutor, has proven a crime charged and each element of that crime beyond a reasonable doubt as to a defendant, that defendant is entitled to be found not guilty.

Moreover, he reminded the jury of the State's burden when instructing the jury on defendants' right not to testify, as well as each time he discussed an element of an offense that the State had to prove.

After the jurors began deliberating they requested reinstruction on the elements of each offense. The judge gave them a new verdict sheet that included all the elements of each charged and lesser included offense, and also reinstructed them on the elements of all of the charged and lesser included offenses. He gave a thorough explanation of Count Two's lesser included offenses, including the following portion of the charge on attempt:

> [I]f you find that there was an attempt or—that the defendants tried to insert the bat into [M.G.]'s vagina but didn't succeed in doing so then that may constitute the offense of attempted aggravated sexual assault. If you find beyond a reasonable doubt, number one, the defendant or his accomplice attempted to sexually penetrate [M.G.] with a bat; . . . .

He then reinstructed the jury on Count Three and its lesser included offenses, including attempt:

> The next lesser included offense under three (b) is second degree attempted aggravated sexual assault, attempting to penetrate [M.G.]'s vagina with a bat while he was aided by one or more of the persons and while he or his accomplice used physical force or coercion.
>
> The elements are he attempted to sexually penetrate [M.G.]'s vagina with a bat or his accomplice did;
>
> Secondly, the defendant acted on purpose;
>
> Thirdly, he was aided or abetted by another person, an accomplice;

And fourthly, he or his accomplice used physical force or coercion to attempt to penetrate [M.G.]'s vagina with a bat.

Although the judge did not immediately follow his initial charge on Count Three with an explanation of that count's lesser included offenses, he subsequently did so twice when going over the two different versions of the verdict sheet. In addition, he had earlier given a comprehensive explanation of the identical lesser included offenses when he was charging on Count Two. Looking at the overall charge, we have no doubt that the jurors were well instructed on the lesser included offenses. *Wilbely, supra,* 63 *N.J.* at 422, 307 *A.*2d 608. Moreover, they had the detailed verdict sheet in the jury room at all times.

Similarly, any error in the instruction on the burden of proof for attempted sexual assault was ameliorated by the more appropriately phrased instructions both before and after that mistake, and by the many times the judge reminded the jury of the State's burden of proof. This was not a case in which there was one incorrect instruction delivered after one general burden of proof instruction. *See State v. Erazo,* 126 *N.J.* 112, 121, 594 *A.*2d 232 (1991). The jury was reminded of the State's burden consistently throughout the charge, and only one of the several attempt charges was questionably phrased. The "overall impression" that the jury was left with was clearly the correct one. *See State v. Heslop,* 135 *N.J.* 318, 326, 639 *A.*2d 1100 (1994).

Kyle's argument that the inconsistency in the verdicts on Counts Two and Three demonstrates that the judge's instruction confused the jury is not persuasive. "[I]t is firmly settled that consistency in verdicts is not required under our law." *State v. Ortiz,* 253 *N.J.Super.* 239, 244, 601 *A.*2d 735 (App.Div.), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992). We "should not speculate as to whether the verdicts resulted from jury lenity, compromise, or mistake not adversely affecting the defendant." *State v. Grey,* 147 *N.J.* 4, 11, 685 *A.*2d 923 (1996). Unlike the facts in *Grey,* the counts on which Kyle was convicted were supported by sufficient evidence to permit a rational fact finder to find guilt beyond a

reasonable doubt. *Id.* at 10, 685 *A.*2d 923; *Ortiz, supra,* 253 *N.J.Super.* at 245, 601 *A.*2d 735. In *Grey,* the inconsistent verdict was an obvious result of jury instructions which misled the jury. 147 *N.J.* at 12–14, 685 *A.*2d 923. Here, when read as a whole, the judge's instruction on lesser included offenses was correct. The reason for any inconsistencies in the jury's verdict here is not apparent, and we need not inquire as to the reasons for the verdict.

## XIV

Defendants contend that juror misconduct such as prayer sessions led by a juror who was later dismissed, sleeping and inattentive jurors, comments made to the jurors from outside sources, jurors' verbal and written comments about witnesses before deliberations began, and certain alleged conduct involving a replica bat that was in evidence, denied them a fair trial and tainted the verdict.

The Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to trial by an impartial jury. Therefore, a defendant is entitled to a jury that will decide the charge according to the evidence presented in court and a jury that is free of outside influences. *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983). The jury verdict must be "free from the taint of extraneous considerations and influences," and a new trial will be granted when jury misconduct or the intrusion of irregular influences into jury deliberations "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951). The test is "not whether the irregular matter actually influenced the result but whether it had the capacity of doing so." *Ibid.*

Where the record does not show whether the irregularity was prejudicial, it will be presumed to be so. *State v.*

*Grant,* 254 *N.J.Super.* 571, 584, 604 *A.*2d 147 (App.Div.1992) (citing *State v. Sachs,* 69 *N.J.Super.* 566, 588, 174 *A.*2d 605 (App.Div.1961)). In a criminal case, a presumption of prejudice attaches when there is "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury." *Remmer v. United States,* 347 *U.S.* 227, 229, 74 *S.Ct.* 450, 451, 98 *L.Ed.* 654, 656 (1954). The burden is upon the government to establish that the juror contact was harmless to the defendant. *Ibid.*

In *State v. Bey, supra,* 112 *N.J.* at 79, 548 *A.*2d 846, our Supreme Court explained the procedure for determining whether juror misconduct or outside influences were prejudicial. The *Bey* jurors were exposed to mid-trial publicity about defendant's pending trial for another murder, as well as prior robbery and assault convictions. The Court held that the judge's refusal to poll the jurors concerning their exposure to the newspaper articles denied defendant a fair trial and required reversal. *Id.* at 81, 548 *A.*2d 846.

The procedure adopted in *Bey* is that when presented with a post-impanelment motion to question the jury about exposure to trial publicity, the judge is to first examine the information to determine if it has the capacity to prejudice the defendant, and if it does, the judge must conduct voir dire, preferably individually in camera, to determine whether any jurors were exposed to the information. *Id.* at 84–86, 548 *A.*2d 846. If they were, the judge then questions each juror individually to determine what information was learned and whether the juror is capable of deciding the case impartially, based solely on the evidence presented at trial. *Id.* at 87, 548 *A.*2d 846. The federal courts use this procedure not only in cases of outside influences, but also when jurors engage in premature deliberations, i.e., before hearing all the evidence and the jury instruction and then formally deliberating as a collective body. *United States v. Resko,* 3 *F.*3d 684, 688 (3d Cir.1993).

The thrust of the New Jersey and federal cases on mid-trial allegations of jury misconduct is that the trial judge must

make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality. *See State v. Weiler*, 211 *N.J.Super.* 602, 609–12, 512 *A.*2d 531 (App.Div.), *certif. denied*, 107 *N.J.* 37, 526 *A.*2d 130 (1986). Although the trial judge has discretion in the way to investigate allegations of jury misconduct, an adequate inquiry on the record is necessary for the purposes of appellate review.

On January 13, 1993, after the State rested its case, the judge informed counsel he had received a phone call that morning from a juror, relating that each morning since the beginning of the trial, a juror had been conducting prayer sessions with the jury and that he said a special prayer for M.G. The same juror was also reported to have commented that he was "sick and tired of women being raped," and that some of the jurors were concerned about his open-mindedness. After discussing the matter with counsel, the judge voir dired each juror individually and then segregated each afterward until he decided how to proceed.

This procedure took place over a two day period, after which the judge put on the record in open court his findings of fact and legal conclusions. He found that the juror, a prison guard, was a Sunday school and Bible teacher who had aspirations toward the ministry. Although he had disclosed during voir dire that he was a prison guard, it was not brought out that he was an aspiring minister. At the juror's suggestion, beginning around the first day of trial, a brief prayer was led by one juror with the others listening and some saying amen at the end. As many as six or seven jurors took turns leading the prayers. Most of the prayers were on neutral subjects such as the outside world, general blessings, a prayer for someone who was ill, and a prayer for the jury to be fair. However, on occasion, when the prison guard prayed, he referred to M.G., "the poor victim," and to help her deal with this situation. After being chided by other jurors about praying for M.G., he included a prayer for the defendants in a

prayer he led. Each of the jurors said that nothing in the prayers had affected their ability to decide the case fairly and impartially based on the evidence. The judge found that although they had acquiesced in the holding of the prayer sessions, they had not acquiesced in the portions of the prayers to which defendants were objecting, and their ability to continue was not lost.

The judge also found that the juror had inappropriately commented that he was sick and tired of women being raped and that defendants would eventually be in a correctional facility. The judge found credible the statements of the only three jurors who heard those comments that the statements did not affect their ability to fairly decide the case. He also found that a juror had commented on her disbelief of any opinions expressed by psychiatrists and psychologists due to her personal experience with a son who was classified as educably mentally retarded. This fact had not been revealed during voir dire. The juror also disclosed she had also discussed her concerns about the prayer sessions with an outsider, her pastor.

Defendants moved for a mistrial on the ground that the prison guard had already made up his mind about the guilt of defendants and the rest of the jurors, by participating in the prayers the juror initiated, had shown that they could not be impartial. In the alternative, defendants requested that the prison guard be removed. The prosecutor agreed this juror should be removed, but opposed a mistrial. He renewed an earlier request that the other juror be excused due to her talking during testimony and her admission that she had discussed the situation with her minister. The prosecutor also sought removal of a third juror on the basis of her comment to another juror that "[a]ll the witnesses are liars."

The trial judge relying largely on *Panko, supra,* 7 *N.J.* at 55, 80 *A.*2d 302, and *State v. LaFera,* 42 *N.J.* 97, 109, 199 *A.*2d 630 (1964), ruled that a mistrial was not required because he found credible the jurors' statements that neither the prayers nor the comments of other jurors had prejudiced their ability to fairly decide the case. He found the jurors' comments to be merely

premature expressions of opinions that would have been proper if expressed during their deliberations, that no extraneous evidence was injected into the proceedings, and that none of the comments suggested venal motives or racial or religious bias. He also cited *State v. Hubbard*, 123 *N.J.Super.* 345, 351, 303 *A*.2d 87 (App.Div.), *certif. denied*, 63 *N.J.* 325, 307 *A*.2d 98 (1973), for its holding that a mistrial should be granted only if a manifest injustice would result from continuation of the trial and submission of the case to the jury.

The judge dismissed the two jurors both sides requested, but rejected the State's application to excuse the juror who commented "All the witnesses are liars," finding this premature opinion about the credibility of the witnesses did not approach the necessary standard for excusing a juror. This juror, however, was later dismissed as inattentive. He questioned the remaining jurors several days thereafter about their exposure to newspaper articles about the jurors' misconduct and learned that two jurors had been told by friends and family that they had read about jurors misbehaving. The jurors maintained they had not been affected by this information, and the judge found no further inquiry necessary.

A review of the record surrounding the prayer controversy reveals that the judge scrupulously investigated the situation, taking two full days to thoroughly question all of the jurors about their involvement in and feelings about the prayers and comments. The record supports his finding that no outside influences had infiltrated the jury room. Although some jurors may have formed premature opinions, this is not the sort of irregularity that automatically requires a mistrial or new trial. *LaFera*, *supra*, 42 *N.J.* at 109, 199 *A*.2d 630.

We find nothing so inherently prejudicial about juror prayers, where no outsider enters the jury room to conduct them and the prayer is voluntary and neutral, as would require reversal. When the one juror fashioned prayers for the victim, other jurors had him add a prayer for defendants and later told him that the

prayers should be silent. The jurors' concern that a neutral atmosphere prevail in the jury room detracts from any suggestion that defendants could not be judged fairly by the jurors. The fact that jurors acquiesced in the brief morning prayers does not evidence a lack of impartiality. Rather, it reinforces the judge's conviction that the jurors were well intentioned and sincerely desired to act impartially and justly.

We are satisfied that the judge recognized and applied the mandate of *Panko, supra,* 7 *N.J.* at 61, 80 *A.*2d 302, that there be an affirmative showing that any irregularity did not prejudice defendants. While the judge may have relied in part on the jurors' subjective belief in their own impartiality, he clearly made his own judgment of the jurors' credibility and properly recognized the relatively low risk of danger from the prayers and the premature expressions of opinion. His dismissal of the two jurors who had shown an inability to follow instructions removed those persons from the panel who had a potential to prejudice defendants. We are also convinced that he appropriately dealt with the matter of jurors being exposed to press leaks.

Regarding the various assertions of jurors sleeping or being inattentive during trial, it is obvious that trial judges should take corrective action when any counsel brings to the their attention sleeping jurors. *See State v. Burks,* 208 *N.J.Super.* 595, 612, 506 *A.*2d 779 (App.Div.1986), and *State v. Reevey,* 159 *N.J.Super.* 130, 133, 387 *A.*2d 381 (App.Div.), *certif. denied,* 79 *N.J.* 471, 401 *A.*2d 228 (1978). Here, when defense counsel commented about a sleeping juror, the judge made several suggestions as to possible corrective action, but defense counsel requested that nothing be done. After voir dire on the prayer matter, defense counsel requested that a juror who was allegedly inattentive be dismissed, and the judge granted the request. Counsel did not make any similar request as to other jurors. We find no abuse of discretion by the trial judge in these circumstances.

On November 20, 1992, when the jurors returned to court after a few days off due to the death of the father of Kyle's counsel, the

judge learned that five of the jurors had returned to work and been exposed to comments on the case by their co-workers. He individually voir dired each juror and learned that four had heard such comments as, "Did you hang the bastards?" and "When are you going to hang them?" The fifth juror had been given the "thumbs down" signal. The jurors made various responses to these comments, such as, to say they could not speak about the case, to just walk away, to become "irritated that people are so quick to make decisions when they don't have all the facts," and to tell them that they are "not supposed to say things like that to me." None of the comments came from supervisors, and none of the jurors felt influenced by the comments.

Defendants moved for a mistrial based on the anti-defendant public sentiment expressed to the jurors. The judge denied the motion based on the jurors' assurances that the comments did not affect them, as well as on his assessment of their credibility. He stated he thought the jurors responded "candidly, honestly and appropriately." He agreed to a request by a defense counsel that if there is another recess in the trial the jurors be asked not to return to work without first asking the judge for permission. He also instructed the jurors not to consider public sentiment.

The instances cited were not *private* communications made to the jurors about the trial as in *Remmer, supra,* 347 *U.S.* at 227–28, 74 *S.Ct.* at 450–51, 98 *L.Ed.* at 654–55, where a private communication raised the specter of corruption, intimidation, and coercion. Moreover, any presumption of prejudice was rebutted as the judge's thorough inquiry into the outside communication resulted in his objective evaluation that prejudice was not established. *See United States v. Console,* 13 *F.*3d 641, 667–68 (3d Cir.1993), *cert. denied,* 511 *U.S.* 1076, 114 *S.Ct.* 1660, 128 *L.Ed.*2d 377 and 513 *U.S.* 812, 115 *S.Ct.* 64, 130 *L.Ed.*2d 21 (1994). The expressions of co-workers' opinions were not intimidating or coercive to the jurors. The judge not only conducted a thorough voir dire of the jurors, he allowed defendants to participate in the

questioning. The judge took all proper precautionary measures and the voir dire showed that no prejudice resulted from the co-workers' comments.

On October 29, 1992, the prosecutor informed the court that there were "signs" in the jury room. A court officer retrieved them and they were read into the record. There was also a picture of a female child with the words "Can she? Can't she? Could she? Couldn't she? Would she? Wouldn't she?" The court officer said that only a "search for the truth" sign was hanging on a wall, and the rest were stacked on the table. He also said that one juror was responsible for all of them.

The judge said that the sign with the female on it "merely asks some questions. It doesn't presuppose any answer or point of view." He did not consider the signs to be "of any great moment," but rather light-hearted commentary on the attorneys for the most part. Nonetheless, he offered to voir dire the jury or provide additional instructions if counsel requested. Defense counsel did not want the jurors to be questioned further, but the prosecutor did. The judge asked the jurors whether there were any other notes and whether there was anything about the notes that would make it difficult to be impartial. They said no to both questions. He then instructed them that they are not to discuss the case or take notes on the case, even in the jury room.

Defendants do not contend that the signs and the juror's behavior alone should have led to a mistrial, but rather that the cumulative effect of the signs, which they asserted were a trivialization of the case, and the other misconduct required a declaration of a mistrial. However, to our view, none of the defense counsel appeared to consider the signs were such an infraction as would require relief other than instruction on not discussing the case. Nor did they want the juror who made the signs removed the following day when the prosecutor asked for his dismissal. If defendants considered the behavior so innocuous that they did not join the prosecutor in asking for the juror's removal, we fail to see how it can lend weight to a cumulative effect argument. The

judge handled the matters appropriately. Moreover, the jurors were voir dired individually and were extremely candid about their own and other jurors' comments during the trial. We have reviewed those observations and comments and find no matters therein that were not properly dealt with by the trial judge. *R.* 2:11–3(e)(2).

On March 8, 1993, in chambers the judge informed counsel of a letter he received from a juror complaining about statements made by another juror, accusing her of "having mixed dealings" with a juror who had been dismissed. In addition, as deliberations began, the juror who made the comment was reported to have said: "I have worked with retarded people and I know how they act, they all act the same way, they approach people sexually and need affection." Defense counsel moved for a mistrial or, in the alternative, for removal of the juror who did the accusing and made the comment. The prosecutor opposed the motion, arguing that if anyone should be removed, it should be the juror who had been accused.

The judge concluded the matters raised in the letter did not meet the standard required for granting a mistrial in that the misconduct did not have a tendency to influence the jurors in arriving at their verdict in a manner inconsistent with the legal proofs and the court's charge. *See Panko, supra,* 7 *N.J.* at 55, 80 *A.*2d 302. He said the accused juror denied having any contact with the dismissed juror after the juror's dismissal and thus, there was no danger of outside influences. The judge noted that the accusing juror had disclosed during voir dire his prior experience with retarded people. The judge found the comment did not have the capacity to influence the jury because he had instructed the jury several times that the issue in the case is not whether M.G. is mentally retarded but rather mentally defective.

Counsel did not ask the judge to voir dire the jurors on the matter and the judge rejected the possibility on his own, saying that he was reluctant to voir dire jurors in the middle of their deliberations as it would entail delving into their thought process-

es, which he considered inappropriate and unnecessary. Instead, he instructed the jurors that they were to decide the case on the evidence only and not bring into their deliberations outside experience or comments made by dismissed jurors.

On March 12, 1993, one of the sheriff's officers advised the court that a juror had demanded that the replica bat be removed from the jury room. Defense counsel moved for a mistrial or, in the alternative, for removal of the bat and voir dire to determine whether any physical intimidation of the juror who made the request was occurring. The judge found no grounds warranting a mistrial, and again expressed his reluctance to inquire into the jurors' internal deliberations, especially when he was not satisfied that there was either misconduct or irregular influences infecting the deliberative process. He found insufficient grounds to require the "extraordinary intervention" of voir dire. However, he decided to remove the bat and broom from the jury room.

At the time of this discussion the jury foreperson had just submitted a note saying that the jury had reached a decision on five of the nine counts, but was "having problems" it wanted to discuss with him in chambers. The judge asked the jurors whether removal of the bat would remedy the problems and permit them to continue their deliberations. The jury indicated that removal of the bat and broom resolved the difficulty and it would continue to deliberate.

 Investigation into allegations of juror misconduct or irregular influences before a verdict is the proper procedure in order to determine whether the misconduct had the capacity to prejudice the defendant. *Bey, supra,* 112 *N.J.* at 79, 548 *A.*2d 846. However, courts are reluctant to attack a verdict after a trial by probing into the deliberative process of the jurors. *LaFera, supra,* 42 *N.J.* at 106, 199 *A.*2d 630. Here, the jury had reached a partial verdict, and the judge was reluctant to begin probing into the jurors' internal deliberations. More important was the lack of any misconduct about which to question the jurors. There was no suggestion of outside influence, racial prejudice, media exposure,

or any of the other sorts of irregular influences sufficient to create a potential for prejudice. We find no abuse of discretion. The judge in each instance took the appropriate corrective action, and a mistrial or new trial due to juror misconduct was not warranted.

## XV

Defendants maintain that the judge erred in sentencing them to indeterminate terms not to exceed fifteen years, when the presumptive term under the youthful offender statute is five years. While faulting the findings on aggravating and mitigating factors, they urge that even if the judge's conclusion that the factors were in equipoise is accepted, it mandates imposition of no more than a five-year term. Kevin contends that he should have been sentenced as a second degree offender because his mitigating factors preponderated both quantitatively and qualitatively over his aggravating factors. The Scherzers maintain that probationary terms were appropriate. Kyle further faults the judge for applying the same aggravating and mitigating factors to him as it did to Archer, as he was convicted of a lesser degree crime on one of the counts.

The youthful offender statute, *N.J.S.A.* 2C:43–5, gives sentencing courts the option, to be exercised in the court's sound discretion, of sentencing offenders who are under twenty-six years old to a youth correctional facility rather than to prison. *State v. Styker*, 262 *N.J.Super.* 7, 21, 619 *A.*2d 1016 (App.Div.), *aff'd o.b.*, 134 *N.J.* 254, 633 *A.*2d 521 (1993). While this option is available to even first and second degree offenders, *Styker*, 134 *N.J.* at 255, 633 *A.*2d 521 (Wilentz, concurring), the presence of a serious first degree offense may be a reason for not sentencing under the youthful offender statute. *Styker*, 262 *N.J.Super.* at 22, 619 *A.*2d 1016.

The relevant portion of the statute provides:

Any person who, at the time of sentencing, is less than 26 years of age and who has been convicted of a crime may be sentenced to an indeterminate term at the

Youth Correctional Institution Complex, ... instead of the sentences otherwise authorized by the code....

[*N.J.S.A.* 2C:43-5.]

The length of a sentence under the statute is governed by *N.J.S.A.* 30:4-148 (emphasis added), which provides:

> The courts in sentencing pursuant to N.J.S. 2C:43-5 shall not fix or limit the duration of sentence, but the time which any person shall serve in confinement or on parole shall not in any case exceed 5 years or the maximum term provided by law for the crime for which the prisoner was convicted and sentenced, if such maximum be less than 5 years; provided, however, that *the court, in its discretion, for good cause shown, may impose a sentence greater than 5 years, but in no case greater than the maximum provided by law,* and the commitment shall specify in every case the maximum of the sentence so imposed.

Thus, the ordinary term for a youthful offender sentenced under *N.J.S.A.* 2C:43-5 and *N.J.S.A.* 30:4-148 is five years. *State v. Davis,* 229 *N.J.Super.* 66, 83, 550 *A.*2d 1241 (App.Div. 1988). It can, however, in the judge's discretion be raised for "good cause," up to the maximum provided by law for the offense in question. *Ibid.* The sentencing court should state on the record the reasons constituting "good cause" for imposing a youthful offender sentence that is greater than five years. *Ibid.*

In *State v. Jarbath,* 114 *N.J.* 394, 402, 555 *A.*2d 559 (1989), where defendant was convicted of second degree manslaughter, the sentencing judge did not state reasons, but the Supreme Court inferred that the reason for extending the sentence was based on the judge's findings regarding aggravating and mitigating factors, which "are clearly probative of those elements that are most relevant to sentencing." In *Davis, supra,* 229 *N.J.Super.* at 83, 550 *A.*2d 1241, where defendant was convicted of two counts of second degree sexual assault and two counts of endangering the welfare of a child, the observation was made that "it would be difficult to justify an 'implicit' enunciation of good cause" from the aggravating and mitigating factors because the sentencing judge had found the factors to be "more or less in equipoise." In *State v. Ferguson,* 273 *N.J.Super.* 486, 642 *A.*2d 1008 (App.Div.), *certif. denied,* 138 *N.J.* 265, 649 *A.*2d 1285 (1994), a panel of this court addressed how a sentencing judge could satisfy the "good cause"

standard of *N.J.S.A.* 30:4–148 and opined that a judge could rely on the aggravating and mitigating factors of *N.J.S.A.* 2C:44–1 as a basis to explain the sentence, and these factors could be considered an "inferred articulation" of the good cause standard. *Id.* at 494, 642 *A.*2d 1008.

For both practical and historical reasons, we reject defendants' premise that absent a preponderance of aggravating factors over mitigating factors, the sentencing judge should be precluded from finding that the "good cause" standard has been met. *Id.* at 495, 642 *A.*2d 1008. The reasoning in *Ferguson* does not support such a premise nor does any other case cited to us support so strict an interpretation of the sentencing judge's discretion. Nor do we find that conclusion compelled by logic or reason.

To the extent that it can be argued that the statement in *Ferguson* that because the judge found the mitigating factors outweighed the aggravating factors, he was "foreclosed from increasing the presumptive term beyond five years," is applicable in all youthful offender cases, *id.* at 497–98, 642 *A.*2d 1008, we do not accept such a proposition. Such a holding would restrict the sentencing judge in first and second degree convictions to a five year maximum indeterminate term if applying the youthful offender statute, unless the aggravating factors outweighed the mitigating factors, regardless of the nature of the crime or its circumstances. This would preclude effective use of the youthful offender statute in cases where the sentencing factor were in equipoise or favored mitigation, but the facts warranted more than a five year maximum. Most first degree crimes, even if mitigated, would require a greater maximum sentence than five years where an indeterminate term is imposed.

For all three defendants the judge found three aggravating factors, the nature and circumstances of the offense, the gravity and seriousness of the harm to the victim, and the need for deterrence. He also found three mitigating factors, defendants have no history of prior delinquency or criminal activity, their

conduct was a result of circumstances unlikely to recur, and their youth. He gave the greatest weight to the first two aggravating factors, the nature of the offense and the gravity of the harm to the victim, and to the last mitigating factor, defendants' youth, while ultimately concluding that the aggravating and mitigating factors were in equipoise.

The judge opted to sentence defendants under the youthful offender statute due to their youth at the time they committed the offense, their lack of prior involvement with the criminal justice system, and their prospects for rehabilitation. He then stated the following reasons for imposing a maximum indeterminate sentence beyond the five year ordinary maximum:

> You were convicted of first-degree crimes, the range is 10 to 20 years, the presumptive term is 15 years and that's reflective of the serious crime you committed. I also consider the balance of the aggravating and mitigating factors. I found them to be in equipoise and I found therefore the presumptive term of 15 years to be applicable and finally I've considered the law on parole in determining to raise the maximum indeterminate term up to 15 years.

Thus, his three reasons for imposing sentences of up to fifteen years were: (1) defendants were convicted of a first degree crime, (2) the aggravating and mitigating factors were in equipoise, and (3) the law on parole eligibility.

The judge was obviously concerned that if he sentenced defendants to the five-year ordinary term under the youthful offender statute, they would be paroled in two and two-thirds years. This is a concern with most first and second degree convictions, and it is appropriate that a sentencing judge consider the parole consequences of the sentence. *State v. Day,* 216 *N.J.Super.* 33, 38, 522 *A.*2d 1019 (App.Div.), *certif. denied,* 107 *N.J.* 640, 527 *A.*2d 462 (1987). Such a concern is not only a valid reason for not sentencing certain defendants under the youthful offender statute, but we believe it to constitute "good cause" for going over the statute's ordinary term of five years even where the factors are in equipoise or favor mitigation.

Chief Justice Wilentz in his concurring opinion in *Styker, supra,* 134 *N.J.* at 254, 633 *A.*2d 521, noted the potential disparity in

parole eligibility depending on whether first and second degree offenders are sentenced according to the ordinary sentencing scheme or as youthful offenders. Under the ordinary scheme, a first degree offender receiving the presumptive term of fifteen years imprisonment would be presumptively eligible for parole after serving one-third of that term, or five years. *Id.* at 258, 633 *A.*2d 521; *N.J.S.A.* 30:4–123.51(a). However, youthful offenders guilty of a first degree crime, and given the five-year maximum indeterminate term are presumptively eligible for parole after thirty-two months (two and two-thirds years). *Id.* at 258, n. 7, 633 *A.*2d 521; *N.J.S.A.* 30:4–123.51(d).

An appellate court should modify a sentence only when the sentencing court's determination was "clearly mistaken." *State v. Jabbour,* 118 *N.J.* 1, 6, 570 *A.*2d 391 (1990). We find no merit to the remaining arguments raised by defendants concerning the judge's findings and assessment of the sentencing factors. *R.* 2:11–3(e)(2); *see State v. Roth,* 95 *N.J.* 334, 364–65, 471 *A.*2d 370 (1984).

## *CONCLUSION*

We vacate defendants' convictions only on Count Three. We remand to the Law Division so that the convictions on Counts One and Two can be "unmerged" from Count Three and defendants can be resentenced. *State v. Smith,* 279 *N.J.Super.* 131, 144, 652 *A.*2d 241 (App.Div.1995); *State v. Pennington,* 273 *N.J.Super.* 289, 295, 641 *A.*2d 1085 (App.Div.), *certif. denied,* 137 *N.J.* 313, 645 *A.*2d 141 (1994).

The judge on resentencing must note that defendants were not proved to have committed sexual assault by force or coercion and that consequently all have one less conviction and that Kyle's convictions are both for second degree crimes.

Affirmed in part and reversed in part. Remanded for resentencing.